ST. REGIS PAPER CO. *v.* UNITED STATES.

No. 47.  Argued November 9, 1961.—Decided December 11, 1961.

210

*Horace R. Lamb* argued the cause and filed briefs for petitioner.

*Solicitor General Cox* argued the cause for the United States. With him on the briefs were *Assistant Attorney General Loevinger, Acting Assistant Attorney General Kirkpatrick, Daniel M. Friedman, Lionel Kestenbaum* and *Richard A. Solomon.*

MR. JUSTICE CLARK delivered the opinion of the Court.

Pursuant to § 6 (b) of the Federal Trade Commission Act,[1] the Commission issued orders directing the petitioner and corporations acquired by it to submit various

---

[1] "The commission shall also have power—

"(b) To require, by general or special orders, corporations engaged in commerce, excepting banks, and common carriers subject to the Act to regulate commerce, or any class of them, or any of them, respectively, to file with the commission in such form as the commission may prescribe annual or special, or both annual and special, reports or answers in writing to specific questions, furnishing to the commission such information as it may require as to the organization, business, conduct, practices, management, and relation to other corporations, partnerships, and individuals of the respective corporations filing such reports or answers in writing. Such reports and answers shall be made under oath, or otherwise, as the commission may prescribe, and shall be filed with the commission within such reasonable period as the commission may prescribe, unless additional time be granted in any case by the commission." 38 Stat. 721, 15 U. S. C. § 46 (b).

reports. Petitioner failed to furnish all of the requested information, and the United States at the request of the Commission brought the present suit in the District Court seeking (1) a mandatory injunction to compel compliance with all of the orders [2] and (2) statutory forfeiture of $100 for every day petitioner was in default of those orders directed specifically to it.[3]

---

[2] Section 9 of the Federal Trade Commission Act provides that "[u]pon the application of the Attorney General of the United States, at the request of the commission, the district courts of the United States shall have jurisdiction to issue writs of mandamus commanding any person or corporation to comply with the provisions of this Act or any order of the commission made in pursuance thereof." 38 Stat. 722, 15 U. S. C. § 49.

[3] Section 10 of the Federal Trade Commission Act provides: "That any person who shall neglect or refuse to attend and testify, or to answer any lawful inquiry, or to produce documentary evidence, if in his power to do so, in obedience to the subpoena or lawful requirement of the commission, shall be guilty of an offense and upon conviction thereof by a court of competent jurisdiction shall be punished by a fine of not less than $1,000 nor more than $5,000, or by imprisonment for not more than one year, or by both such fine -and imprisonment.

"Any person who shall willfully make, or cause to be made, any false entry or statement of fact in any report required to be made under this Act, or who shall willfully make, or cause to be made, any false entry in any account, record, or memorandum kept by any corporation subject to said sections, or who shall willfully neglect or fail to make, or to cause to be made, full, true, and correct entries in such accounts, records, or memoranda of all facts and transactions appertaining to the business of such corporation, or who shall willfully remove out of the jurisdiction of the United States, or willfully mutilate, alter, or by any other means falsify any documentary evidence of such corporation, or who shall willfully refuse to submit to the commission or to any of its authorized agents, for the purpose of inspection and taking copies, any documentary evidence of such corporation in his possession or within his control, shall be deemed guilty of an offense against the United States, and shall be subject, upon conviction in any court of the United States of competent jurisdiction, to a fine of not less than $1,000 nor more than $5,000, or to

The District Court found that some of the requests were unenforceable because of vagueness and that others had been answered either specifically or by reference to materials previously furnished. Petitioner was directed to answer the remaining items, including those calling for file copies of census reports. However, because *some* of the requests were too vague to be enforced, the District Court did not award the statutory forfeitures. 181 F. Supp. 862. The Court of Appeals affirmed insofar as the District Court ordered compliance, but reversed that portion of the decision refusing to award the statutory forfeitures. 285 F. 2d 607. We granted a limited writ of certiorari because of a conflict in the circuits on the question of compulsory production of the copies of census reports and the general importance of certain other questions in the administration of the investigatory pro-

---

imprisonment for a term of not more than three years, or to both such fine and imprisonment.

"If any corporation required by this Act to file any annual or special report shall fail so to do within the time fixed by the commission for filing the same, and such failure shall continue for thirty days after notice of such default, the corporation shall forfeit to the United States the sum of $100 for each and every day of the continuance of such failure, which forfeiture shall be payable into the Treasury of the United States, and shall be recoverable in a civil suit in the name of the United States brought in the district where the corporation has its principal office or in any district in which it shall do business. It shall be the duty of the various United States attorneys, under the direction of the Attorney General of the United States, to prosecute for the recovery of forfeitures. The costs and expenses of such prosecution shall be paid out of the appropriation for the expenses of the courts of the United States.

"Any officer or employee of the commission who shall make public any information obtained by the commission without its authority, unless directed by a court, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine not exceeding $5,000, or by imprisonment not exceeding one year, or by fine and imprisonment, in the discretion of the court." 38 Stat. 723, 15 U. S. C. § 50.

visions of the Federal Trade Commission Act. 365 U. S. 857. On motion of petitioner, we also granted a stay tolling the further running and accumulation of forfeitures awaiting our decision. We now affirm the judgment of the Court of Appeals.

Petitioner contends that it cannot lawfully be required to produce copies of statutory reports made by it to the Census Bureau because of their confidential nature. The remainder of the inquiries found enforceable by the District Court are not now contested by the petitioner. As to the forfeitures, petitioner advances several arguments: (1) The statutory forfeiture of § 10 is not applicable because it applies only to a failure to furnish "reports" while the inquiries directed to petitioner called for answers to specific questions; (2) No forfeitures can be imposed because the orders were only partially enforceable; and (3) It is a denial of due process to assess penalties for failure to obey orders during a time petitioner was without remedy to test their validity.

## I.

The controversy culminating in this litigation had its inception in September 1956. At that time the Commission requested petitioner to furnish voluntarily information concerning certain of its corporate acquisitions to enable the Commission to determine whether there had been any violations of the antitrust laws. A year later, having failed to obtain the bulk of the requests, the Commission served a subpoena *duces tecum* on petitioner. It covered somewhat the same information as was previously requested but, in addition, required similar data concerning three more corporate acquisitions effected in the interim. In due time petitioner fully complied with the subpoena, and the hearing before the Examiner was concluded. After reviewing the material, however, the Commission found that it needed additional information and

in June 1958 requested petitioner's counsel to furnish it. A running exchange of correspondence between petitioner's counsel and the Commission's staff followed. Counsel contended, *inter alia,* that no additional information was needed and requested a statement of necessity therefor. Upon counsel's insistence, three separate levels of authority in the Commission, from the local attorney in New York City to the Director of the Bureau of Investigation in Washington, explained the need for the information, advised that the request therefor had been fully authorized and requested petitioner to comply therewith. This discussion continued for over six months during which time petitioner furnished only two documents of the many requested. On January 6, 1959, the Commission instigated a formal investigation of the acquisitions made by petitioner during the preceding five years. Pursuant to this investigation the Commission issued six orders requiring the filing within 30 days of "special reports" which were to contain specified information and documents. On motion of petitioner, the Commission temporarily suspended these orders while it considered petitioner's motion that they be vacated. On May 6, 1959, the motion to vacate was denied, and petitioner was directed to comply by May 28, 1959. On June 4, 1959, the Commission broadened its investigation to cover two corporate acquisitions by petitioner occurring after the instigation of the formal investigation. Accordingly three more orders requiring "special reports" were issued. Upon petitioner's failure to comply with either set of orders, notices of default were served on June 20, 1959, and July 24, 1959, respectively. This complaint was filed on September 15, 1959, three years after the inquiry was opened. The complaint sought a mandatory injunction which would compel petitioner to file with the Commission the "special reports" sought by all nine orders. However, forfeitures were claimed only for petitioner's

failure to respond to orders numbered 1 and 7, which were directed specifically to petitioner. The other seven orders had been directed to corporations acquired by petitioner rather than to it.

## II.

Among the items ordered enforced and with which the petitioner still refuses to comply are requests for file copies of certain reports previously made to the Census Bureau. The petitioner claims each of these to be confidential. There is a conflict between the Courts of Appeal on the point.[4] Here both the District Court and the Court of Appeals have held these file copies not restricted, and with this conclusion we agree.

Petitioner's claim is based on §§ 8 and 9 (a) of the Census Act, 13 U. S. C. §§ 8–9 (a), and assurances of confidentiality by the Government. It can be noted immediately that § 8 does not in any way support petitioner's position. This section grants the Secretary of Commerce the discretion to furnish to named authorities data taken from information furnished the Census Bureau on censuses of population, agriculture and housing. Subsection (c) thereof provides that when the Secretary furnishes such data it shall "[i]n no case" be used by the recipient "to the detriment of the persons to whom such information relates." Not only has the Commission not been furnished any information by the Secretary, but the information involved does not relate to the particular censuses covered by the section, and so this section is clearly inapplicable here.

The prohibitions of § 9 (a) apply to the Secretary, and other officers and employees of the Department of Commerce. Each of them is prohibited from using the infor-

---

[4] Compare *Federal Trade Comm'n* v. *Dilger*, 276 F. 2d 739 (C. A. 7th Cir. 1960), with *United States* v. *St. Regis Paper Co.*, 285 F. 2d 607 (C. A. 2d Cir. 1960).

mation supplied for other than statistical purposes; and from making any publication thereof wherein the name or identity of those furnishing information is revealed; and, finally, from permitting anyone outside of the employ of the Department of Commerce to "examine the individual reports" filed.[5] The form of the report provided by the Census Bureau is marked "Confidential" and in addition states that "[i]t cannot be used for purposes of taxation, investigation or regulation."[6] The Bureau also furnishes the reporting corporations a copy of this form, such as the one involved here. The copies are marked "Keep this copy for your files," and the Bureau is said to have advised reporting companies that they are confidential. It also appears that a Presidential Proclamation admonished reporting companies that "[t]he Census has nothing to do . . . with the enforcement of any national, state, or local law or ordinance. There need be no fear that any disclosure will be made regarding any individual person or his affairs. For the due protection of the rights and interests of the persons furnishing information every

---

[5] *Information as confidential; exception.*

"(a) Neither the Secretary, nor any other officer or employee of the Department of Commerce or bureau or agency thereof, may, except as provided in section 8 of this title—

"(1) use the information furnished under the provisions of this title for any purpose other than the statistical purposes for which it is supplied; or

"(2) make any publication whereby the data furnished by any particular establishment or individual under this title can be identified; or

"(3) permit anyone other than the sworn officers and employees of the Department or bureau or agency thereof to examine the individual reports." 13 U. S. C. § 9 (a).

[6] "CONFIDENTIAL.—This report is required by Act of Congress, approved August 31, 1954, (13 U. S. C. 131 and 224). Your report is confidential and only sworn Census employees will have access to it. It cannot be used for purposes of taxation, investigation or regulation."

employee of the Census Bureau is prohibited, under heavy penalty, from disclosing any information which may thus come to his knowledge." [7]   Petitioner also relies upon an opinion of the Attorney General, 36 Op. Atty. Gen. 362 (1930).

Similar contentions were considered by the Court of Appeals for the Seventh Circuit in *Federal Trade Comm'n* v. *Dilger*, 276 F. 2d 739 (1960), where it was held that these "assurances of confidentiality and protection constitute a pledge of good faith on the part of the Congress, the President and the Department of Commerce. . . . The United States has given its word and should be permitted to keep it."   276 F. 2d, at 744.   It concludes that since the Commission cannot obtain the original it should not be permitted *"to do indirectly that which it cannot do directly."   Id.,* at 743.

The Solicitor General contends that for the purposes of this case petitioner has waived the point by voluntarily submitting like data to the Commission during its investigation herein.   We cannot agree.   Reaching the merits of the issue he points out that the government agencies are at loggerheads on the problem, the Department of Commerce, Census Bureau and the Bureau of the Budget believe that the copies are not subject to legal process, while the Federal Trade Commission and the Antitrust Division of the Department of Justice, which filed this suit, contend to the contrary.   The Solicitor General, "fully recognizing the delicate balance of opposing considerations," has concluded "on balance" that the copies are not subject to compulsive production.   As has been noted, we do not agree.

As we have seen, the prohibitions against disclosure contained in § 9 run only against the officials receiving such information and do not purport to generally clothe

---

[7] Proclamation by President Hoover, November 22, 1929, 46 Stat. 3011, 3012.

census information with secrecy. The Solicitor General admits that "literally construed" the restrictions of the statute go no further. But he insists that since the purpose of the statute is to encourage the free and full submission of statistical data to the Bureau, this can be accomplished only through the creation of a confidential relationship which will extend the privilege to the petitioner and like reporting companies. We do not believe that the language of the President, *supra*, gives the statute the meaning claimed for it; nor can the legend on the Census Bureau forms or its advice to reporting companies extend the coverage of the Act. Cf. *United States* v. *California*, 332 U. S. 19, 39–40 (1947); *United States* v. *Stewart*, 311 U. S. 60, 70 (1940); *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 225–227 (1940). We fully realize the importance to the public of the submission of free and full reports to the Census Bureau, but we cannot rewrite the Census Act. It does not require petitioner to keep a copy of its report nor does it grant copies of the report not in the hands of the Census Bureau an immunity from legal process. Ours is the duty to avoid a construction that would suppress otherwise competent evidence unless the statute, strictly construed, requires such a result. That this statute does not do. Congress did not prohibit the use of the reports *per se* but merely restricted their use while in the hands of those persons receiving them, *i. e.*, the government officials. Indeed, when Congress has intended like reports not to be subject to compulsory process it has said so. See 45 U. S. C. § 41,[8] 49 U. S. C. § 320 (f).[9] Moreover, although tax returns, like these

---

[8] "That neither said report nor any report of said investigation nor any part thereof shall be admitted as evidence or used for any purpose in any suit or action for damages growing out of any matter mentioned in said report or investigation." 36 Stat. 351, 45 U. S. C. § 41.

[9] "(f) No report by any motor carrier of any accident arising in the course of the operations of such carrier, made pursuant to any require-

census reports, are made confidential within the government bureau, Internal Revenue Code of 1954, §§ 6103, 7213 (a), copies in the hands of the taxpayer are held subject to discovery.[10] Likewise the Criminal Code, 18 U. S. C. § 1905,[11] prohibits federal employees generally from disclosing trade secrets and other business data received in the course of their official duties, but the same information is obtainable from the reporting company's files or personnel by judicial process.

This conclusion is buttressed by the fact that though petitioner furnishes the required reports to the Census Bureau it is not relieved from furnishing the same information to the Federal Trade Commission. This is made certain by an Act of Congress specifically providing that nothing in the Census Act "shall be deemed to revoke or

---

ment of the Commission, and no report by the Commission of any investigation of any such accident, shall be admitted as evidence, or used for any other purpose, in any suit or action for damages growing out of any matter mentioned in such report or investigation." 49 U. S. C. § 320 (f).

[10] *E. g., United States* v. *O'Mara,* 122 F. Supp. 399 (D. C. D. C. 1954). Contra, *O'Connell* v. *Olsen & Ugelstadt,* 10 F. R. D. 142, 143 (D. C. N. D. Ohio 1949).

[11] "Whoever, being an officer or employee of the United States or of any department or agency thereof, publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; shall be fined not more than $1,000, or imprisoned not more than one year, or both; and shall be removed from office or employment." 18 U. S. C. § 1905.

impair the authority of any other Federal agency with respect to the collection or release of information." 13 U. S. C. § 132. It appears, therefore, that through the use of special reports the Commission could require the petitioner to supply the identical information from its files. Hence by securing the retained file copy the Commission is merely obtaining in a form already prepared that information which it has the power to require petitioner to furnish from its records.

### III.

Petitioner next claims that the orders required "answers in writing to specific questions" under § 6 (b) as distinguished from the "special reports" also authorized by that section, but that the forfeiture provision of § 10 penalizing the failure to file "any annual or special reports" does not include the phrase "answers in writing to specific questions" and is, therefore, inapplicable. We do not agree.

The Commission contends that its orders here in fact called for information in the nature of "special reports," and it so designated each of the nine orders at the time of their issuance. Examination of the orders by no means proves the Commission to be in error, for it appears that practically all of the requests called for the furnishing of statistical or like information, details of organization and operation, specific documents, etc. As the Court of Appeals stated, "the cumulative effect of all the questions is substantially that of a request for a report." 285 F. 2d, at 615.

While this is true, it cannot be denied that in many instances specific information was requested and "answers in writing to specific questions" were contemplated. But this does not disqualify the materials from being special reports, for the statutory reference to "answers in writing to specific questions" merely elaborates the power to require special reports.

The source of the Commission's power, as we have noted, is § 6 (b), see note 1, *supra,* which authorizes the Commission to order corporations to file "annual or special, or both annual and special, reports or answers in writing to specific questions." Since the forfeiture provision of § 10, see note 3, *supra,* only refers to "any annual or special report," petitioner argues that forfeiture is inapplicable to a corporation failing to give "answers in writing to specific questions," which it contends is a separate power quite distinct from the power to order reports. But if this is true there would be no penalty where a corporation deliberately refused to comply with a lawful Commission order to answer specific questions, for the only penalty available against *corporations* is the forfeiture provision. Thus a corporation that refused to file an annual or special report would be subject to a $100 per day forfeiture. An individual under subpoena who refused to appear and testify or supply documents would be subject to a fine of $1,000 to $5,000 and/or a jail sentence up to three years. But under petitioner's interpretation of the Act there would be no penalty whatsoever where a corporation deliberately failed to file answers to specific questions. The only remedy would be a mandatory injunction to force it to do so. We cannot attribute such an anomaly to Congress. Rather we would assume that in placing the phrase "answers in writing to specific questions" in § 6 (b) Congress was merely explicating what the Commission might require a corporation to include in an annual or special report.

Moreover, the legislative history of the Act does not support petitioner's theory that the phrase "answers in writing to specific questions" refers to a separate power of the Commission. Both the House and Senate bills dealing with the Federal Trade Commission (or Interstate Trade Commission, as it was called in the House) had provisions enabling the Commission to order annual and

special reports, but neither mentioned answers to specific questions. The House Committee Report on the original House version of the Act stated:

> "The commission, under this section, [later 6 (b)] may also require such special reports as it may deem advisable. By this means, if the ordinary data furnished by a corporation does not adequately disclose its organization, financial condition, business practices, or relation to other corporations, there can be obtained by a special report such additional information as the commission may deem necessary." H. R. Rep. No. 533, 63d Cong., 2d Sess. 4.

The phrase "answers in writing to specific questions" first appeared in the Conference Report, but the report by the House Managers explaining the modifications of the House bill did not mention it (although it discussed some other changes in the annual and special report provisions of the House bill). H. R. Rep. No. 1142, 63d Cong., 2d Sess. Similarly, the explanation of the Conference Report by the Senate Managers in debate makes it clear that the changes made in conference were of the nature of new, clarifying phraseology (with two exceptions not relevant here). 51 Cong. Rec. 14768–14769. If the conference had intended to give the Commission a separate, new power which was not included in either the House or Senate bill, surely there would be some mention of it in the reports by the managers.

Finally, it should be noted that a construction of the statute which empowers the Commission to particularize its requests for annual and special reports with specific questions will tend to avoid objections of vagueness. The requests directed to petitioner which were not particularized—items 1 (h); 3 (j), (k); 5 (j), (k); 6 (j); 7 (j); 8 (j); and 11 (a)–(l) of the first order; and item 5 of the seventh order—were struck down by the District

Court as unenforceable. Such general requests for reports without specificity place the reporting company in a difficult position, leading to expensive and time-consuming litigation as well as frustrating the Commission's attempt to obtain information.

## IV.

The District Court held that since the Commission orders were "partially defective," petitioner had a valid reason for challenging them, and therefore no forfeitures accrued. Petitioner supports this holding by asserting that many of the items included in the Commission's orders were held unenforceable by the District Court, and that under *Bowman Dairy Co.* v. *United States,* 341 U. S. 214 (1951), forfeiture should not be imposed for noncompliance with substantially defective orders. The Court of Appeals disagreed, holding that forfeiture had occurred and that the daily penalty began to run 30 days after the notice of default on the first set of the Commission's orders.[12] We agree with the Court of Appeals and conclude that the single daily penalty runs until the date of our stay, February 7, 1961.

Petitioner's figures relative to the percentage of defective inquiries are based on analysis of all nine orders. However, the suit for forfeiture was brought only in respect to the two orders directed to petitioner, and we will restrict our consideration to the 134 inquiries included therein. Prior to the judgment 63 of these items remained unanswered. The trial judge struck 10 of them as unenforceable, leaving 53 which he ordered to be answered. However, whether one takes the above figures, or those of the petitioner asserting that only 37% of the questions were enforced by the trial court, or the Government's claim that two-thirds of the questions were

---

[12] The second set of orders was merely supplementary, so only a single daily penalty accrued.

valid and unanswered at the time of the suit, this case need not go off on a mathematical formula. The record fully supports the conclusion of the Court of Appeals that this is not "a case involving single oversight or an honest mistake in a good faith attempt to comply with the Commission's order." 285 F. 2d, at 614. Nor, as the concurring opinion found, is it a case of "such extensive invalidity that there is no longer an intelligible requirement" for a report. 285 F. 2d, at 616.

Petitioner asserts that even partial invalidity of the order prevents the application of the forfeiture provision, arguing that the case is controlled by the rule in *Bowman Dairy Co., supra.* In that case the Court concluded that "one should not be held in contempt under a subpoena that is part good and part bad." 341 U. S., at 221. But that rule cannot be considered apart from its facts. There the defendant could not appeal from the contested order, but was able to challenge it only by disobeying and appealing the contempt conviction. It was in review of that conviction—the defendant's first opportunity to review the validity of the order—that this Court held that its partial invalidity barred the punishment. Here petitioner might have delayed accrual of the forfeitures pending determination of the merits or obtained a separate judicial determination of the validity of the orders before the penalties began to accrue, as we point out *infra.* Rather than attempting such procedures it defied large parts of the orders. It cannot now be heard to complain because such defiance was in error.

Petitioner also contends that the trial court, after finding the orders partially invalid, should have stricken them and required the Commission to issue new ones if it wished to proceed with the inquiry. We agree with the trial court and the Court of Appeals that § 6 (c) of the Administrative Procedure Act, 60 Stat. 241, 5 U. S. C. § 1005 (c), authorized the procedure the court followed,

*i. e.,* ordering partial compliance. That section directs the court to sustain "any such subpena or similar process or demand to the extent that it is found to be in accordance with law . . ." Nor do we see any substance to the further contention that in directing partial compliance the trial judge treated those items found enforceable as subpoenas and therefore subject solely to contempt action. The various requests were severable, and the court's order was not in substitution of the Commission's orders but merely an enforcement of them, in accordance with § 9 of the F. T. C. A. authorizing the court to compel obedience to lawful Commission orders. Finally, petitioner argues that the case should have been remanded to the trial court for determination of whether the forfeiture should apply. However, once the Court of Appeals held that the default was within the forfeiture provision of § 10, its penalties accrued, and there was nothing remaining open for decision that required a remand to the District Court.

## V.

Petitioner's final point is that to impose the forfeitures will deprive it of property without due process of law. This argument is based on the premise that the orders of the Commission were not judicially reviewable except at the risk of paying daily forfeitures accumulating throughout the period of noncompliance, including the period of judicial review. We need not consider this point at length for it appears that petitioner did not try to obtain judicial review prior to the commencement of this action by the Government, nor did petitioner seek a stay once the litigation had begun. This inaction was in part based upon petitioner's reliance on *Federal Trade Comm'n* v. *Claire Furnace Co.,* 274 U. S. 160 (1927). This reliance was misplaced. In that case an injunction was sought against the Commission restraining it from enforcing certain

orders issued under the same section of the Act involved here. The Commission, however, had not issued any notice of default on the orders, as was done here, nor had the orders been forwarded to the Attorney General for enforcement. This Court properly held an injunction would not lie since the subjects of the reports could not suffer any injury or penalty at that point in the investigation. As Chief Justice Taft said, "Until the Attorney General acts, the defendants can not suffer, and when he does act, they can promptly answer and have full opportunity to contest the legality of any prejudicial proceeding against them." 274 U. S., at 174.

Upon the commencement of the action by the Government, petitioner might have then sought a stay, as it did when the decision went against it in the Court of Appeals.[13] Moreover, after the entry of the notices of default by the Commission, petitioner might have itself sought relief before the § 10 forfeitures began to accrue instead of waiting for the Attorney General to sue for their collection. As was said in *United States* v. *Morton Salt Co.,* 338 U. S. 632, 654 (1950), "we are not prepared to say that courts would be powerless" to act where such orders appear suspect and ruinous penalties would be sustained pending a good faith test of their validity. There the record did not present and the Court did not determine "whether the Declaratory Judgment Act, the Administrative Procedure Act, or general equitable powers of the

---

[13] Petitioner unsuccessfully moved in the Court of Appeals for a postponement of the effective date of the Commission's orders. Coming when it did, however, we cannot say that such denial was an abuse of discretion. Cf. *Virginian R. Co.* v. *United States,* 272 U. S. 658 (1926). Furthermore, a short while thereafter we stayed the accumulation of further penalties when the petition for writ of certiorari was granted. If petitioner had unsuccessfully sought a stay in the District Court, a different question might have been presented. That action, after final judgment, could have been reviewed both in the Court of Appeals and here.

courts would afford a remedy if there were shown to be a wrong, or what the consequences would be if no chance is given for a test of reasonable objections to such an order." Similarly, as this matter comes here now, the petitioner has pursued none of these remedies, and we could not therefore say that it had "no chance" to prevent the running of the forfeiture pending a test of the validity of the orders. Cf. *United States* v. *L. A. Tucker Truck Lines,* 344 U. S. 33, 37 (1952); *Natural Gas Pipeline Co.* v. *Slattery,* 302 U. S. 300, 310 (1937). We note, however, that the Declaratory Judgment Act, 28 U. S. C. § 2201, provides that "In a case of actual controversy within its jurisdiction . . . any court . . . may declare the rights . . . of any interested party seeking such declaration . . . ." This appears sufficient to meet petitioner's needs.

This Court cannot forgive statutory penalties once they legally attach and, finding no grounds upon which we can strike them down, the judgment of the Court of Appeals is

*Affirmed.*

Mr. Justice Black, with whom Mr. Justice Whittaker and Mr. Justice Stewart concur, dissenting.

I dissent from the Court's holdings (1) that petitioner's copies of census reports submitted to the Census Bureau are not privileged from production by § 9 of the Census Act, and (2) that for its refusal to produce these copies and to answer certain of many questions asked it by the Federal Trade Commission, petitioner must pay a penalty of $100 for each day since that refusal up to the time, many months later, when this Court granted a stay as to future penalties.

*First.* Section 9 (a) of the Census Act, set out in note 5 of the Court's opinion, with exceptions not here material, provides that neither the Secretary of Commerce, nor any other officer or employee of the Department of Commerce or any bureau or agency thereof, may use the information

furnished in census reports except for census purposes, make any publication of the data contained in such reports as coming from the establishment or individual reporting it, or permit any person except officers and employees of the Census Bureau to examine such reports. Moreover, in securing from petitioner the very reports, copies of which are here being held subject to subpoena by the Federal Trade Commission as a step towards government regulation of the petitioner, the form supplied by the Census Bureau told petitioner:

> "Your report is confidential and only sworn census employees will have access to it. It cannot be used for purposes of taxation, investigation or regulation."

The President of the United States backed up these promises of Congress and the Census Bureau with a proclamation in which he stated unequivocally: "No person can be harmed in any way by furnishing the information required." 46 Stat. 3011, 3012. I agree with the Seventh Circuit Court of Appeals that "These assurances of confidentiality and protection constitute a pledge of good faith on the part of the Congress, the President and the Department of Commerce." *Federal Trade Comm'n* v. *Dilger*, 276 F. 2d 739, 744.

It is true, as the Court emphasizes, that although the Census Act, the Census Bureau and the President promised that the Census Bureau would keep census reports purely confidential, neither the Act, the Bureau nor the President literally promised in so many words that other government agencies such as the Federal Trade Commission would never subpoena and use copies of those reports prepared and kept in reliance upon the Government's promise of secrecy. The Court holds that, because the Government did not so expressly bind itself with respect to actions it may take against copies of these reports through the Federal Trade Commission, the

solemn and comprehensive promises of secrecy which it made need not be honored. But surely the Government's promises, fairly construed, do not indicate that the scope of the protection afforded against the use of census reports "for purposes of taxation, investigation or regulation" is limited to the originals of those reports and to the Census Bureau alone. That Bureau does not itself even engage in the activities against which the use of these reports is protected. Quite plainly, the promised protection was against governmental "taxation, investigation or regulation" generally, and, to protect the integrity of that promise, it is of course necessary that all of the particular arms of Government which are engaged in those activities be bound by the Government's pledges. Our Government should not, by picayunish haggling over the scope of its promise, permit one of its arms to do that which, by any fair construction, the Government has given its word that no arm will do. It is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their Government. Cf. *Rock Island, Arkansas & Louisiana R. Co.* v. *United States,* 254 U. S. 141, 143.

*Second.* The petitioner is being penalized $100 per day for its failure to produce copies of its census reports along with answers to certain of the voluminous questions propounded to it by the Federal Trade Commission. Many questions had already been answered prior to the time penalties began to run. The District Court has held that a very substantial number of the other questions asked need not be answered, and I do not understand that this Court now holds otherwise. So far as the Commission's demand for production of the census reports is concerned, petitioner could quite reasonably have felt that it was under no obligation to comply because of the Government's numerous promises that these reports would be

treated as confidential. Indeed, the very position taken by petitioner as to the privileged nature of its census reports was held to be correct in the *Dilger* case, decided just three weeks before the District Court decision in this case. All of this plainly shows, I think, that, with regard to some of the information sought, indeed a very substantial part of it, there was a serious, good-faith controversy concerning the Commission's power to compel disclosure. Under these circumstances I agree with the District Court's conclusion that these heavy statutory penalties should not have been imposed. It is practically the universal rule that laws imposing penalties of this kind should be strictly, not expansively, construed. Applying that standard, I am by no means sure that the penalty provisions of the statute upon which this judgment rests can be construed so as to justify the penalties here at all.

I would reverse this judgment.