**David C. TOBIAS and Jonergin Co., Inc.**

v.

**Alfred KWIATEK, Arthur Berman, Jonergin Vermont, Inc. and Jonergin, Inc.**

Civ. Nos. 82–128, 80–273.

United States District Court, D. Vermont.

June 24, 1983.

**514**

Robert D. Rachlin, Downs, Rachlin & Martin, South Burlington, Vt., for plaintiffs.

Michael S. Brow, Sylvester & Maley, Burlington, Vt., for Kwiatek and Berman.

Frederic W. Allen, Dinse, Allen & Erdmann, Burlington, Vt., for Jonergin Vermont and Jonergin, Inc.

## DEFENDANTS' MOTIONS TO COMPEL; MOTIONS FOR PROTECTIVE ORDERS

HOLDEN, District Judge.

The questions presented derive from various motions by the defendants to compel discovery of a large number of documents related to Perma-Chrome, Inc. ("Perma-Chrome"), a Vermont corporation begun by the individual plaintiff in this action.

It appears from the pleadings that David C. Tobias, the plaintiff, and Alfred Kwiatek and Arthur Berman, the defendants, are the three equal and only shareholders of Jonergin Vermont, Inc. ("Jonergin Vermont"), a Vermont corporation. This company is the holding company for an operating company, Jonergin, Inc. ("Jonergin Delaware"), a Delaware corporation conducting operation in Vermont. The claims in this suit arise from the removal by Kwiatek and Berman of Tobias from his position as treasurer of Jonergin Delaware, and from counter-claims by the defendants alleging various breaches of fiduciary and contractual duties owed by Tobias to Jonergin Vermont and Jonergin Delaware.

Tobias is the sole shareholder of Jonergin Co., Inc. ("Jonergin Canada"), a Canadian corporation. Jonergin Canada and Jonergin Delaware entered a bi-lateral agreement in 1972. Both corporations are engaged in the manufacture and sale of labels and forms, more particularly including metallized papers and films used in the manufacture of these products. Perma-Chrome a Vermont corporation designed to operate as the United States arm of Jonergin Canada, has never commenced doing business here or elsewhere. Tobias owns 50% of the stock of Perma-Chrome, and the remaining 50% is owned by Helmut Schmook, a West German citizen. The defendants assert as one of their claims that Tobias, in part through the Perma-Chrome venture, is competing or intends to compete with Jonergin Delaware, in contravention of his fiduciary duties and in breach of contractual agreements. Thus, the relevancy of the documents sought here is their capability to shed light on the claim

that Tobias breached various duties to Jonergin Vermont and Jonergin Delaware by instituting competing ventures.

The defendants filed a request to produce documents directed to Tobias. This request included all documents relating to Perma-Chrome, including an application and related materials submitted to the Vermont Industrial Development Authority ("VIDA") in order to obtain financial assistance in beginning the venture. The defendants also issued subpoenas duces tecum to Albert W. Coffrin, III, the manager of VIDA, requesting the Perma-Chrome application and all related materials in the possession of VIDA, and to Robert Justis, Director of the Economic Development Department of the Agency of Development and Community Affairs, requesting similar documents. The defendants further requested that Steven Bourgeois, an officer of the Franklin-Lamoille Bank, provide information relating to that institution's dealings with Perma-Chrome. The first two state officers have requested that this court issue protective orders with regard to certain of the materials sought by the defendants, and Steven Bourgeois has indicated that the Franklin-Lamoille Bank will not release the documents in its possession relating to Perma-Chrome without an order from the court.

At a hearing held before the court on February 25, 1983, the parties agreed that the document request directed to Robert Justis would be suspended pending the resolution of the motions relating to VIDA and to the plaintiff himself. It was further agreed that the plaintiff and VIDA would produce all the requested materials for *in camera* inspection by the court, in order that the court might determine what claims of privilege are applicable to these papers. The documents were so submitted to the court, and the parties have reached agreement regarding the discoverability of certain of the materials. The court has examined the documents submitted for inspection, and sets forth herein its conclusions.

VIDA asserts two types of governmental privileges with respect to the materials in its possession relating to Perma-Chrome.

These are the "executive privilege" and the "government reports" or "official information" privilege. The parties have not referred to decisional law of Vermont on governmental privileges; this analysis proceeds on the basis of federal law.

The executive privilege is intended to shield from discovery intra-governmental memoranda that contain the thought processes, opinions and judgments of government officers leading up to agency decisions. These are often referred to as "pre-decisional memoranda." The purpose of this privilege is to allow the officers of government to express their views freely and to facilitate the uninhibited exchange of ideas in government decision making. *Machin v. Zuckert,* 316 F.2d 336 (D.C.Cir. 1963); *Mobil Oil Corp. v. Dept. of Energy,* 520 F.Supp. 414 (S.D.N.Y.1981). This privilege may be qualified in two ways, however. First, purely factual materials and materials obtained outside the government itself and incorporated into the opinion memoranda may be discovered after the privileged materials are expunged. *Branch v. Phillips Petroleum Co.,* 638 F.2d 873, 879–80 (5th Cir.1981); *Black v. Sheraton Corp. of America,* 564 F.2d 531 (D.C.Cir.1977). Second, the privilege for the opinion materials is not itself absolute. In some cases, the litigants' need for the materials may be balanced against the public harm caused by the potential chilling effect on the governmental decision making process. *Black v. Sheraton, supra,* 564 F.2d 531; *McClelland v. Andrus,* 606 F.2d 1278, 1287, n. 54 (2d Cir.1979). Such a balancing need not be undertaken in the instant case, as the parties have agreed that any deliberative materials need not be disclosed by VIDA.

The official information, or government reports, privilege is the more important one in the present context, since this privilege does serve to protect purely factual material and material that originates outside the government. *See, e.g., Branch v. Phillips Petroleum Co., supra,* 638 F.2d 873; *McClelland v. Andrus, supra,* 606 F.2d 1278; *Association for Women in Science v. Califano,* 566 F.2d 339 (D.C.Cir.1977); 8 C.

Wright, A. Miller and F. Elliott, *Federal Practice and Procedure* § 2019. The Perma-Chrome application submitted by the plaintiff to VIDA comprises this type of material.

■ The privilege for government reports is created by statutes which affirmatively authorize the classification of certain documents as confidential. The same result may be obtained through regulations if such regulations are promulgated pursuant to specific statutory authority. The purpose of the privilege is to facilitate the flow of necessary information to the government by enabling private persons to submit information without fear of it becoming public. The privilege is not without qualification, however. When the statutory provision is general, with no reference to confidentiality or disclosure in judicial proceedings, the litigants' need for the materials must be balanced against the potential harm to the government's interest in the free access to information for various purposes. *E.g., Association for Women in Science v. Califano, supra,* 566 F.2d 339.

An analysis of the statutes and regulations governing the operation of VIDA leads to the conclusion that certain reports and information submitted to that agency are subject to the government reports privilege. 10 V.S.A. § 216(3) authorizes VIDA to establish regulations relating to applications for financial assistance that are submitted to the Authority, and to the disclosure of such materials. This provides the necessary statutory authority for VIDA to promulgate confidentiality regulations. Such regulations were promulgated, and are set forth in Article III of the by-laws of the Authority. Section 3 of this Article III lists twelve exceptions to the general policy of making documents in the possession of VIDA public, and Section 4 specifically declares items falling within the scope of these exceptions to be "confidential." These exceptions are set forth in the margin.[1]

---

1. By-laws of VIDA, Article III, Section 3, create the following twelve exceptions to the general rule that materials in the possession of the Authority are public:

 1. Records which by law are designated confidential or by some such similar term;
 2. Records which by law may only be disclosed to specifically designated persons;
 3. Records which if made public pursuant to this subchapter, would cause the custodian to violate a statutory or common law privilege;
 4. Tax returns or related documents, correspondence and certain types of substantiating forms which include the same type of information as in the tax return itself, filed by a person or a company with the Authority in connection with the Authority's statutory purposes;
 5. Personal documents relating to an individual, including information in any files maintained by the Authority to hire or evaluate any consultant or to hire, evaluate, promote, or discipline any employee of the Authority, information in any files relating to personal finances, medical or psychological facts concerning any individual involved in any transaction to which the Authority is a party provided however, that all information and personnel files of an individual employee or a consultant of the Authority shall be made available to that person or his designated representative;
 6. Trade secrets including, but not limited to any formula, plan, pattern, process, tool, mechanism, compound, procedure, production data, marketing data, or compilation of information which is not patented, which is known to only certain individuals within a commercial concern and which gives its user or owner an opportunity to obtain a business advantage over competitors who do not know it or use it;
 7. Lists of names compiled or obtained by the Authority when disclosure would violate a right of privacy or produce public or private gain;
 8. Information pertaining to real or personal property where such information is in the possession of the Authority pursuant to an application submitted by any nongovernmental entity prior to public announcement of the project or consideration of the matter by the Authority and information pertaining to appraisals or purchase price or real or personal property prior to the formal award of contracts therefore;
 9. Records which are relevant to litigation to which the Authority is a party of record, provided all such matters shall be available to the public after ruled discoverable by the court before which the litigation is pending, but in any event upon final termination of the litigation;
 10. Records related specifically to negotiation of contracts;
 11. All records and documents relating to the financial and business history, current

 VIDA asserts a privilege only with respect to those portions of the materials submitted that fall within one of these twelve exceptions, and with respect to deliberative memoranda. A close analysis of all of these materials in light of the exceptions is not necessary, since the entire Perma-Chrome application was also submitted to the court by the plaintiff himself. The government reports privilege belongs to the government alone; it does not shield a private party from disclosure of information in his possession on the ground that it was provided to the government unless specifically protected by statute. *St. Regis Paper Co. v. United States,* 368 U.S. 208, 217–19, 82 S.Ct. 289, 294–296, 7 L.Ed.2d 240 (1961). The general rule is that discovery may be had from a private person in the normal course regardless of the fact that the same information was submitted to the government for some purpose. 8 C. Wright, A. Miller and F. Elliott, *Federal Practice and Procedure* § 2019, at 160–61; *cf. Heathman v. United States District Court,* 503 F.2d 1032 (9th Cir.1974). This principle is consistent with the purposes of the privilege; foreseeable disclosure by the government of confidential information could chill the process of information collection. The persons who provide that information to the government, however, are not thereby relieved of their responsibility to provide it in civil discovery, since this responsibility existed before the information was reported. The court in this case will not require VIDA to release any materials which have been submitted by the plaintiff for inspection, but will require any discovery of duplicative materials to be had from the plaintiff.

The question before the court with respect to the Perma-Chrome application itself is thus narrowed to an examination of the validity of the plaintiff's claims for a protective order covering the material in his personal custody. His claims are (1) lack of relevance; and (2) potential for commercial damage if certain information regarding his affairs were to come into the possession of the defendants.

 The claim of lack of relevance must fail. The materials, to be discoverable, need only be calculated to lead to the discovery of admissible evidence. Fed.R. Civ.P. 26(b)(1). Since one of the major issues in the case is an alleged breach of fiduciary duty to Jonergin Delaware and Jonergin Vermont by Tobias, an investigation of his other business enterprises could be highly relevant. The plaintiff's bald assertion that Perma-Chrome was never intended to compete with these companies cannot serve as a substitute for discovery, where the existence of such an intention is the very heart of the defendants' case.

 The plaintiff is therefore left to rely upon the common law evidentiary privileges which may be applicable, and upon Fed.R.Civ.P. 26(c), which governs the granting of protective orders in discovery proceedings. In general, the court may issue a protective order to protect a person from oppression or undue burden. Fed.R.Civ.P. 26(c)(7) provides that the court may, for good cause shown and where justice requires, order that trade secrets or other confidential research, development or commercial information not be disclosed, or be disclosed in a designated fashion, such as to counsel only. The general nature of the plaintiff's plans for Perma-Chrome is not the sort of technical information contemplated in subsection (7). Further, those materials which reveal the plaintiff's commercial plans are in this context highly relevant to the defendants' case; their need for the information must be balanced against any

condition and future plans of any nongovernmental applicant, or other private party involved to any extent in the matter which the Authority is considering;

12. All records and documents prepared by members of the Authority, its staff, counsel and consultants which relate to or concern the opinion of the members, staff, counsel, or consultants concerning the fi-

nancial and business history, current condition, future or projected plans, legal problems, professional competency or integrity of any nongovernmental applicants, or other parties who may be involved to any extent in the matter which the Authority is considering, or the officers or employees of any such parties.

legitimate reasons the plaintiff has to conceal it.

Discovery will proceed in accordance with this opinion and the results of the court's *in camera* inspection reported in the attached Appendix.

It is so ORDERED.

## APPENDIX

### The Documents

I. *Motion of Steven Bourgeois, as an officer and employee of the Franklin-Lamoille Bank, for a protective order relating to defendants' deposition*

Steven Bourgeois, an officer and employee of the Franklin-Lamoille Bank, moved on November 19, 1982, for a protective order with respect to defendants' deposition of him, and to certain documents relating or referring to Perma-Chrome which are in his possession. This motion is hereby DENIED; the defendants may inquire into information which may have been disclosed to Steven Bourgeois by David Tobias or Perma-Chrome.

II. *Documents relating to Perma-Chrome in the possession of VIDA—Motion to quash subpoena duces tecum by Albert W. Coffrin, III*

VIDA submitted three categories of documents to the court for *in camera* inspection. Category I includes the application for financial assistance submitted to the agency by Perma-Chrome. As stated above, this application is also in the possession of the plaintiff, and it is therefore ORDERED that the defendants may not obtain this application from VIDA in discovery. Part III below sets forth at length what portions of this application material may be obtained from the plaintiff.

Category II consists of an intra-agency memorandum dated August 20, 1981. The court finds that this memorandum consists of intra-governmental deliberative materials which are subject to an executive privilege. The parties have agreed that such materials will not be disclosed, and it is therefore ORDERED that the defendants may not obtain this memorandum.

Category III consists of correspondence and inter-office memoranda in the possession of VIDA and dated between August 19, 1981 and July 20, 1982. The court finds that certain of these items are subject to one of the twelve exceptions to disclosable material, under the VIDA by-laws, Article III, Section 3. These items are listed by date below. All other items in this category are not subject to privilege and will be disclosed to the defendants. It is ORDERED that the following items shall not be disclosed:

May 10, 1982: subject to exception 11.
August 9, 1982: subject to exception 11.
October 20, 1981: subject to exception 11.
August 19, 1981: subject to exception 11.

III. *Documents submitted by the plaintiffs—Motion for protective order by plaintiffs*

The plaintiffs have submitted two categories of materials for *in camera* inspection. The first of these is the Perma-Chrome VIDA application. The second consists of related documents in the plaintiffs' possession. The plaintiffs have tabulated these materials item by item, and the numbers which they have appended to the documents will be used herein to identify them. An index to these materials was submitted to the court by the plaintiffs and appears as a supplement to this Appendix.

A. *The Perma-Chrome Application*

The defendants agreed at the hearing held before this court that they would not seek to discover financial statements of David Tobias or of Jonergin Canada. They have also agreed not to request certain specific items, listed by the plaintiff's numbers as follows: 13.2, 13.3, 13.4, 13.5. These items will therefore not be disclosed to defendants.

The plaintiff has agreed that certain items may be fully disclosed to the defendants. These items are identified as follows: 2.1, 3.1, 3.3, 3.4, 3.5, 3.6, 3.8, 7.1, 7.5, 8.1, 9.5, 11.3, 11.4. All other items contained in the

application are contested. The court has determined that the plaintiff has shown no valid privilege or reason why the court should grant a protective order with regard to the following items, and it is hereby ORDERED that they be disclosed to the defendants:

1.0, 2.4, 3.2, 4.1, 5.1, 5.2, 5.3, 5.4, 5.5, 5.6, 6.2, 6.4, 7.2, 7.3, 7.4, 9.1, 9.2, 9.3, 9.4, 10.1, 11.1, 11.2, 11.5, 12.1, 15.1.

The following item shall be disclosed to counsel for defendants only: 13.1.

The following items are subject to the parties' agreement not to disclose personal financial statements or those of Jonergin Canada, and therefore it is ORDERED that they shall not be disclosed: 2.2, 2.3, 3.7, 6.1, 6.3, 6.5, 6.6, 6.7, 6.8, 6.9.

B. *Other Materials*

The plaintiff has agreed to full disclosure of the following items: 16, 26, 48. These items will therefore be disclosed. He has requested that a number of other items be disclosed to counsel only. The court finds that no reason has been shown to support restricted disclosure in the case of any of these items except two. It is therefore ORDERED that items 33 and 36 be disclosed to defendants' counsel only; defendants are to be given no access to this material. If defendants' counsel determines it to be necessary, these items may be disclosed to an independent expert, unconnected to either of the parties, for assistance in determining the significance of the items.

The court finds that three of the submitted items are subject to protection as technical information of a commercial nature. The court therefore GRANTS plaintiff's request for a protective order with respect to items 34, 35, and 37.

It is hereby ORDERED that the following items be disclosed to the defendants without restriction, as the plaintiff has not shown any valid reason for protection or that the items are subject to any privilege. A number of these items are in fact matters of public record: 17, 18, 19, 20, 21, 22, 23, 24, 25, 27, 28, 29, 30, 31, 32, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 49.

*Supplement to Appendix*

INDEX OF DOCUMENTS REGARDING PERMACHROME AND VIDA SUBMITTED TO THE COURT

EXHIBIT 1: SUMMARY PAGE

1.1 Summary Page

EXHIBIT 2: Personal Resumes

2.1 Wick resume

2.2 Personal Statement from Mr. & Mrs. Schmook (In English)

2.3 Personal Statement from Mr. & Mrs. Schmook (Original German)

2.4 Personal Resume of Mr. David Tobias

EXHIBIT 3: Narrative of Business or Corporate History

3.1 Jonergin, St. Hubert Summary dated 3/3/80

3.2 Information on EDP to complement information in the Jonergin Catalogue.

3.3 Brief description of Jonergin's facilities, services, and products.

3.4 Jonergin Co., Inc. catalogue.

3.5 Cover and photograph from *BAR: Beverage Alcohol Reporter,* March-April-May 1980.

3.6 "Producing the Look of Success," *Canadian Packaging,* June 1981.

3.7 Personal Statement of Mr. & Mrs. Helmuth Schmook (In English)

3.8 Advertisements and Product Samples

EXHIBIT 4: Project Description

4.1 Narrative description of project including financial and technological information.

EXHIBIT 5: Business Plan

5.1 Business plan outline

5.2 Excerpt from Dennison Annual Report

5.3 Highlights of Reports for European, Canadian, and American Markets

5.4 "Metallized Papers: European Market Trends," prepared by Alexander Watson & Associates, Dec. 1980.

5.6 "Etude de Marche du Papier et des Films de Plastique Metallises et Evalu-

ation Technical Economique de Leurs Productions," Ministere de L'Industrie; Commerce et Tourisme, Gouvernement du Quebec; prepared by Lamb, Guay, Inc., May 1981.

EXHIBIT 6: Financial Plan

6.1 Jonergin Co., Inc. Financial Statements

6.2 Letter August 4, 1983 to the Board of Directors of Perma-Chrome, Inc. from Gallagher, Flynn, Crampton & Co. reporting on the attached projected balance sheets of Perma-Chrome, Inc.

6.3 Letter March 24, 1975 to the Shareholders of Jonergin, Co., Inc. from Payne, Patton & Pugsley reporting on their examination of the consolidated balance sheet of Jonergin Co., Inc. and Subsidiary (December 31, 1974) and of the consolidated statements of retained earnings, earnings and changes in financial positions (year ending same). (See 6.5 for financial statements.)

6.4 Perma-Chrome, Inc. Assumptions and Notes to the Projections from October 1, 1981 through September 30, 1984 (page 9 only)

6.5 Jonergin Co., Inc. and Subsidiary Financial Statements as at December 31, 1974 (see 6.3 for cover letter).

6.6 Personal Statement from Mr. & Mrs. Helmut Schmook (In English).

6.7 Personal Statement from Mr. & Mrs. Helmut Schmook (In original German).

6.8 Statement of personal worth of David Tobias.

6.9 Statement of personal worth of J.J. Wick

EXHIBIT 7: Legal Description of Land and Building, etc.

7.1 Brief Outline

7.2 Memo dated 7/16/81 to D. Tobias from J. Wick regarding financing for land.

7.3 TADC Option contract.

7.4 Aerial overview of property.

7.5 "Outline Specification for Proposed Offices & Testing Laboratories for Jonergin Co., Inc. in the Town of St. Albans Industrial Park, Vermont"

EXHIBIT 8: Project Timetable

8.1 Brief Outline attached

EXHIBIT 9: Environmental Review Sheet

9.1 Report on status of Environmental Review Sheet

9.2 Letter July 9, 1981 to Mr. Curtis W. Carter, Existing Industries Specialist with the State of Vermont, from J. Wick

9.3 Memorandum June 18, 1981 to Curt Carter from Harold T. Garabedian, Air Pollution Control Engineer with the State of Vermont

9.4 Letter June 22, 1983 to David Tobias from Curtis W. Carter, Existing Industries Specialist with the State of Vermont

9.5 Blank Environmental Review Sheet Form

EXHIBIT 10: Schedule of Compensation

10.1 Schedule attached.

EXHIBIT 11: Benefits to Area

11.1 List Attached.

11.2 5–19–81 letter to D. Tobias from Steven Bourgeois of Franklin-Lamoille Bank discussing plant location, financing, tax stabilization and on-the-job training information.

11.3 5–15–81 letter to D. Tobias from Steven Bourgeois regarding tax stabilization, plant locations, and a film on Franklin County.

11.4 5–7–81 St. Albans tax proposal.

11.5 Outline

EXHIBIT 12: Details of any Bankruptcy, Receivership, Compromises with Creditors, or any Pending Litigation against the Applicant, Officers, Directors or Principal Stockholder.

12.1 Letter August 3, 1983 to Gallagher, Flynn, Crampton & Company from Downs, Rachlin & Martin responding to D. Tobias' letter of July 27, 1981 regarding pending litigation against David Tobias.

EXHIBIT 13: List of all Banks of the Applicant and Principals.

13.1 Listing attached

13.2 6–30–81 letter to D. Tobias from RG Richard of The Royal Bank of Canada outlining current terms and conditions of Jonergin Co., Inc. line of credit

13.3 7–6–81 letter to RG Richards from D. Tobias acknowledging 6–30–81 letter.

13.4 7–24–81 letter to D. Tobias from Murray Palevsky of the Mercantile Bank of Canada regarding a possible transaction with the Mercantile.

13.5 5–19–81 letter to D. Tobias from Steven Bourgeois regarding plant locations, tax stabilization and on-the-job training information

EXHIBIT 14: If applicant is an out-of-state company, certificate of authority to do business in Vermont.

14.1 Statement that this requirement is not applicable to Perma-Chrome

EXHIBIT 15: VIDA Form 4.

15.1 Completed Form 4.

EXHIBIT 16: "The Beverage-Alcohol Industry and Jonergin," *BAR: Beverage Alcohol Reporter,* March-April-May 1980.

EXHIBIT 17: Exhibit 6 outline which includes a description of required machinery.

EXHIBIT 18: Outline re: "Appraisal of existing building and used equipment to be purchased, if any, performed by a qualified appraiser."

EXHIBIT 19: Exhibit 6 which includes a description of machinery values

EXHIBIT 20: General statement assets offered as collateral.

EXHIBIT 21: Statement of explanation regarding letters of intent from prospective customers.

EXHIBIT 22: 5–14–81 letter from O.E. Harrison of PRG Packaging

EXHIBIT 23: 6–2–81 letter from Lloyd Dunham of Diamond International

EXHIBIT 24: 4–28–81 letter to Metaplast KG from John Field of Russell-Field Paper Co., Inc.

EXHIBIT 25: 5–5–81 letter from Ron Oberlander

EXHIBIT 26: Listing of manufacturers

EXHIBIT 27: 5–9–81 Vermont Marketing Notes (D. Tobias)

EXHIBIT 28: "Metallized Coating Adds New Flair to Paper," *Paper, Film & Foil Converter,* May 1979

EXHIBIT 29: "Metallized Paper Begins to Outshine Aluminum," Reprinted from *Business Week,* June 11, 1977

EXHIBIT 30: Dennison advertising copy

EXHIBIT 31: "Metallized Labels are Beginning to Stick," Reprinted from *Beverage World,* June 1980

EXHIBIT 32: Canada Dry labels (xeroxed)

EXHIBIT 33: 11–25–80 letter to D. Tobias from J. Heffernan of Rothmans of Pall Mall Canada Limited regarding comparison of Jonergin metallized paper samples with Rothman samples and a discussion of Jonergin technical problems

EXHIBIT 34: 11–20–80 Rothman in-house memo to J. Heffernan from B. Keaveney reporting results of lab tests of Jonergin metallized paper samples

EXHIBIT 35: Chart—"Metallized Paper—Physical Properties Comparison"

EXHIBIT 36: 12–2–80 letter to J. Heffernan from D. Tobias discussing goals for improvement of Jonergin metallized paper

EXHIBIT 37: Jonergin Co., Inc. in-house memo from Al. Stittle to J. Wick discussing results of the first metallizing run.

EXHIBIT 38: 10–21–80 letter to D. Tobias from Fred Newhall of VT EDD discussing payback on project bond, taxes at the local level and land cost.

EXHIBIT 39: 5–19–81 letter to D. Tobias from Steven Bourgeois of the Franklin-Lamoille Bank discussion plant locations, local taxes, and on-the-job training information.

EXHIBIT 40: Outline of availability of adequate power

EXHIBIT 41: 4–1–81 letter to D. Tobias from Steven Bourgeois regarding electricity and gas rates

EXHIBIT 42: Rate B Schedule: Commercial-Industrial General Service, issued 4–1–80, effective 5–1–80

EXHIBIT 43: 3–30–81 letter to Scribner Allen from Charles Hurley of CVPSC regarding projected operating costs

EXHIBIT 44: Rate B–1: Commercial-Industrial Space Heating Service Schedule, issued 4–1–80

EXHIBIT 45: 4–23–81 letter to Fred Newhall (ADCA) from D.J. Johnson of Vermont Gas Systems Inc. comparing gas prices in Montreal with those at Vermont Gas Systems

EXHIBIT 46: "Electrical Rates" (Comparison of St. Albans-CVPSC rates with Winooski-Green Mtn. rates)

EXHIBIT 47: Statement and copy of St. Albans Labor Market Area Data

EXHIBIT 48: 4–6–73 letter to D. Tobias from D. Kirker regarding Jonergin Vermont association

EXHIBIT 49: 10–9–80 letter to D. Tobias from L-Gerard Leclerc of Ville de Saint Hubert Service de l'Expansion Economique discussing Mercuriad '81 competition