UNITED STATES of America, Plaintiff,

v.

Jose Angel SANCHEZ–MONTOYA, Defendant.

No. CR 93–287–KN.

United States District Court, C.D. California.

Sept. 13, 1993.

---

Warrington S. Parker III, Asst. U.S. Atty., Los Angeles, CA, for plaintiff.

Deborah Lewis, Deputy Federal Public Defender, Los Angeles, CA, for defendant.

## MEMORANDUM OPINION
## RE: SENTENCING

KENYON, District Judge.

The Defendant has pleaded guilty to returning to the United States illegally after having been officially deported once before, in violation of 8 U.S.C. § 1326. Because the Defendant's previous deportation was subsequent to a conviction for an aggravated felony, and the indictment and plea in this case include that prior felony conviction, he faced a maximum prison term of fifteen years under § 1326(b)(2) for this second immigration violation. *See U.S. v. Campos–Martinez*, 976 F.2d 589 (9th Cir.1992). The guideline range as calculated by the Probation Office is 57 to 71 months. *See* Guideline Presentence Report and Recommendation.

However, prior to accepting the Defendant's guilty plea, this Court informed him that the maximum penalty he would face was two years, not fifteen.[1] The Probation Officer has therefore recommended a sentence of 24 months, notwithstanding the guideline range. Over the government's continuing objection, the Court has now sentenced the Defendant to two years in prison, and in the pages that follow explains why.

## I. *Background*

Prior to his first deportation from the United States, the Defendant, like all illegal aliens being deported, was provided with an Immigration and Naturalization Service ("INS") Form I–294 (in his native tongue). Among other things (including the name of the country to which the deportee was to be sent), the form presented to the Defendant stated as follows:

> Should you wish to return to the United States you must write this office or the American Consular Office nearest your residence abroad as to how to obtain permission to return after deportation. By law (Title 8 of United States Code, Section 1326) any deported person who within five years returns without permission is guilty of a felony. If convicted he may be punished by imprisonment of *not more than two years* and/or a fine of not more than $1,000.00.

(emphasis added).

The government concedes that one principal purpose of the I–294 is to "advise aliens of the consequences of illegal reentry" Opposition at p. 4, and that the form reflects an historic concern that individuals "deported from the United States [be] advised concerning the penalties for returning to the United States without the permission of the Attorney General." Elwood Declaration I, ¶ 4; *accord United States v. Quezada*, 754 F.2d 1190, 1191 (5th Cir.), *reh'g denied*, 758 F.2d 651 (1985) (Form I–294 serves to warn the deportee "of the penalties for illegal entry after deportation"). The more recent version of the form I–294 (dated June 12, 1992) confirms this purpose: it is labelled at the top "Notice of Country to which Deportation has been directed and *Penalty for Reentry*

---

1. *Cf. U.S. v. Marquez*, 941 F.2d 60, 64–65 (2nd Cir.1991) (defendant is entitled to pre-sentencing notice of court's intention to depart from sentencing guidelines).

*without Permission.*" Elwood Decl. I, Exh. 2 (emphasis added).

The government also claims that its motivation in disseminating the I–294 is to preclude deportees from arguing that they "did not knowingly and willfully violate a criminal statute of the United States." Govt's. Supp.Response, Ellwood Decl. ¶ 5. Put another way, the executive branch appears to be acting on a presumption that the general principle that ignorance of the law is no excuse might not apply with equal force in the context of non-citizen deportees and the strict limitations placed on their right to return to this country.

This proffered explanation by the government, however, is problematic. All but one of the circuits to have considered the question have held that § 1326 requires the government to show only that the Defendant acted knowingly and willfully in re-entering the United States. *U.S. v. Espinoza–Leon,* 873 F.2d 743, 746 (4th Cir.1989) (citing cases, including leading decision of the Ninth Circuit in *U.S. v. Pena–Cabanillas,* 394 F.2d 785 (1968)). The government simply is not required to show that the Defendant "acted with specific intent to enter the United States unlawfully." *Id.* And, even under the anomalous mistake of law defense read into § 1326 by the Seventh Circuit, the accused must show that he mistakenly but reasonably believed he had the consent of the Attorney General to lawfully return to the United States. *U.S. v. Anton,* 683 F.2d 1011, 1018 (7th Cir.1982).

In short, no Court has held, and thus the INS could not reasonably believe, that a deportee might successfully raise a pure ignorance of the law defense under § 1326 (i.e., "I didn't know the law forbade my return"). This Court's view is that the more likely explanation for the inclusion of the penalty provisions of § 1326 in the I–294 is deterrence: both individual, by specifically informing the deportee, and general, by getting the word out through individual deportees to those contemplating similar conduct in this country and in the country to which the deportee returns.

The problem in the instant case is that at the time the Defendant received his form I–294 explaining that the maximum term of imprisonment he faced upon illegal re-entry to the United States was two years, in fact, because of a recent change in the law, the maximum term was fifteen years. Anti-Drug Abuse Act of 1988, Pub.L. 100–690, § 7345(a), (b), 102 Stat. 4181, 4471 (1988) (effective November 18, 1988). The government has been unable to determine until when, and to how many deportees, the erroneous I–294 was disseminated. Ellwood Decl. II, ¶ 3. All that the government has been able to offer is an I–294 updated on June 12, 1992, stating correctly the maximum penalties for re-entry. Although the Defendant in this case happened to be presented with a Form I–294 that was erroneous by only one day, the Court must assume that the I–294 was not updated until June, 1992, well over three years after the effective date of the enhanced penalties. This Court has in fact found in its own records (in a similar case) an erroneous Form I–294 dated October 17, 1991, nearly three years after the change in the law. *United States v. Oscar Morales,* CR 92–947 DVK, Exhibit B to Defendant's Position Re: Sentencing Factors (filed March 29, 1993).

The question presented is whether, in light of the false information provided by the government's official form I–294 in this case (and others), the maximum term of incarceration is fifteen years as the statute provides or two years as stated in the official INS notification. The Court emphatically believes the answer to this question must be two years. Although many judges presented with this exact issue have declined to impose such a limitation on defendants' sentences, this Court does not act alone in refusing to sanction the conduct of the government in promulgating the erroneous I–294. *See* Defendant's Motion at 8–9 (describing two year limit on sentence imposed twice by Judge Panner in the District of Oregon); Govt's. Second Supplemental Response at 6 (describing downward departure of Judge Tashima in *United States v. Alba–Esqueda,* CR 92–1002).[2]

---

**2.** In *United States v. Oscar Morales,* supra, this

Court declined to limit Defendant Morales' sen-

## II. *What This Court is Not Holding*

■ The government is correct that the doctrine of entrapment by estoppel is not directly on point in this case. That doctrine applies where: (1) an authorized government official erroneously informs a defendant that contemplated conduct is legal; (2) the defendant relies on the false information; and, (3) such reliance is reasonable, " 'in the sense that a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries.' " *United States v. Tallmadge*, 829 F.2d 767, 774 (9th Cir.1987) (citation omitted).

Here, the Defendant was not misinformed as to the (il)legality of his re-entry into the United States, but instead was told that the maximum sentence he faced was two years when in fact it was fifteen; he has neither argued nor presented any evidence that he actually relied on this incorrect statement of the penalty he faced; and this Court would not be willing to condone any such reliance by deeming it reasonable. Such a finding would in effect put a judicial stamp of approval on a Defendant's knowing and calculated decision to do something which he was specifically informed constituted a felony and which Congress clearly has defined as such.

The government is also right that the Defendant may not successfully seek refuge in the well-established due process notion that protects against convictions under a statute " 'which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.' " *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1938) (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322). Not only is the statute in this case perfectly clear as to what conduct is proscribed, but by signing the I–294 (which was translated into his native tongue), the Defendant acknowledged his understanding that returning to this country without permission was punishable as a felony. Thus,

the fundamental principle that "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes," and that therefore "[a]ll are entitled to be informed as to what the State commands or forbids," is not implicated here. *Lanzetta*, 306 U.S. at 453, 59 S.Ct. at 619.

As Judge Kozinski has noted, the estoppel defense is appropriately "construed very narrowly because it 'permit[s] the individual official to alter or suspend the statutory penal law simply by misinterpreting it.' " *Tallmadge*, 829 F.2d at 776 (dissenting opinion). The Court does not by this opinion, and would not under any circumstances, excuse or condone Defendant's knowing violation of the laws of this country. However, what the government fails to appreciate is that the Defendant does not seek what a successful invocation of due process vagueness or entrapment by estoppel provides—an iron-clad defense against all criminal liability. Instead, Defendant only asks this Court to hold the government to its word: to limit Defendant's prison sentence to that which for years the government (erroneously) has been telling deportees is the maximum. For this much more limited remedy the public policy underpinnings of both the due process and entrapment doctrines provide persuasive support.

## III. *Due Process, Fairness, and Government Responsibility*

■ Justice Holmes long-ago observed that while "it is not likely that a criminal carefully will consider the text of the law before he murders or steals, it is reasonable that a fair warning be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle v. United States*, 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931). Thus, due process and fair notice require that two things be made clear: first, the line distinguishing the lawful from the unlawful, and second, what the law "intends to do" if that line is crossed. In *McBoyle*, the second requirement (the penal-

---

tence to two years despite similar arguments raised by his counsel. Upon further reflection the Court has concluded that its initial judgment

was in error. Defendant Morales is of course free to pursue a modification of his sentence through the appropriate means.

ty for crossing the line) was undisputed, and thus the only issue before the Court was the first: whether the "line" had been made "clear" by the Congress. The Court concluded that it had not.

Subsequent cases, however, have focussed more on the second requirement described by Justice Holmes. In *United States v. Evans*, 333 U.S. 483, 68 S.Ct. 634, 92 L.Ed. 823 (1948), the Court held that where a statute defines two kinds of actions as criminal conduct, but prescribes punishment for only one, a defendant who engages in the other may not be punished therefor, at least in part because, in Holmes' words, the law had not made reasonably clear what it "intended to do" once the line was passed.[3] *Evans* has more recently been cited by the Supreme Court as standing for the proposition that "vague sentencing provisions may pose constitutional questions if they do not state with sufficient clarity the consequences of violating a given criminal statute." *United States v. Batchelder*, 442 U.S. 114, 123, 99 S.Ct. 2198, 2203, 60 L.Ed.2d 755 (1979). *See also Simpson v. Lockhart*, 942 F.2d 493, 497 (8th Cir.1991) (citing *Batchelder* for proposition that a statute that "unambiguously specifies the conduct prohibited *and the penalties authorized upon conviction* ... satisfies the fair notice provisions of the due process clause") (emphasis added).

■ In this case, the executive branch of the government laudably took upon itself the responsibility of informing non-citizen deportees—in their native tongue—of the consequences of returning to this country without permission. However, acting in a fashion that can only be described as grossly negligent, the INS inexcusably proceeded for some three years to misinform deportees of the consequences of unlawfully returning to this country. Although there does not appear to be any statute or regulation imposing on the executive branch the obligation to make the penalty provisions of § 1326 known, once the INS undertook to impart

actual knowledge of the maximum terms of incarceration prescribed by § 1326, it had an obligation to do so accurately and with reasonable care. *See DeShaney v. Winnebago County DSS*, 489 U.S. 189, 201–202, 109 S.Ct. 998, 1006–1007, 103 L.Ed.2d 249 (1989) (citing Restatement (Second) of Torts § 323 for proposition that "one who undertakes to render services to another may in some circumstances be held liable for doing so in negligent fashion"); *Prosser & Keeton on the Law of Torts* § 56 at pp. 375–378 (5th Ed.1984) (explaining that even so-called "good samaritans" are held to at least some minimum standard of care).

This Court does not dismiss lightly the legitimate concern that holding the government in some sense "responsible" for misinforming persons of the proscriptions and penalties imposed by the laws may lead the government to think twice before it again volunteers to impart such information. *Richmond v. Office of Personnel Management*, 496 U.S. 414, 432, 110 S.Ct. 2465, 2476, 110 L.Ed.2d 387 (1990). But in the instant factual setting, such a result is highly unlikely. As discussed above, the government has very strong self-interested reasons to "intervene" and to make the penalties of the illegal re-entry laws widely and *accurately* known. The facts also show that the government's self-interested efforts unfortunately resulted in a systemic error which lasted for three years and can only be characterized as grossly negligent. This Court believes that government accountability under these circumstances requires that any sentence imposed be limited to the maximum prescribed by the government's inaccurate notice.

■ This limitation follows inexorably from the simple but fundamental principle underlying the due process line of cases (*McBoyle, Evans, Batchelder*) discussed above: the government must be clear, accurate and truthful in expressing to the world at large what the criminal laws of this coun-

---

**3.** The *Evans* opinion was most concerned with upholding the basic principle that "defining crimes and fixing penalties are legislative, not judicial functions." 333 U.S. at 486, 68 S.Ct. at 635. Because there were several plausible constructions of the statute, the Court concluded

that "[i]t is better for Congress, and more in accord with its function, to revise the statute than for us to guess at the revision it would make.... We could do no more than make speculation law." *Id.* at 495, 68 S.Ct. at 640.

try forbid and the penalties that may be imposed when these laws are violated. And before convicting and punishing an individual for a violation of the criminal law, a court must satisfy itself that the individual fairly can be charged with knowledge of the conduct proscribed and the penalties prescribed.

 "It is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their government." *St. Regis Paper Co. v. United States,* 368 U.S. 208, 229, 82 S.Ct. 289, 301, 7 L.Ed.2d 240 (1961) (Black, J., dissenting). Just as when the legislature does not clearly define conduct as unlawful, that conduct may not be punished; and just as when the legislature defines conduct as unlawful, but does not prescribe any penalty, no penalty may be imposed; so too, under the unique circumstances of this case, where the government consistently and grossly understates the potential penalties for violation of the law, no greater deprivation of liberty may be exacted than that which the government has represented as the maximum. And, as in each of the due process cases cited above, the question of the individual Defendant's actual and reasonable reliance on any ambiguities, omissions or misstatements relating to the law is simply beside the point. *Cf. Workman v. United States,* 337 F.2d 226, 227 (1st Cir. 1964) (Aldrich, J.) ("Quite apart from any question of inducement, if a court informs a defendant prior to accepting his plea that five years is the maximum sentence, we think this must in fact be the maximum.").

## IV. *Lenity*

 Related to this due process line of cases is the doctrine of lenity in construing ambiguous criminal statutes. In addition to the *McBoyle* fair warning rationale, lenity embodies " 'the distinctive distaste against men languishing in prison unless the lawmaker has clearly said they should.' " *United States v. Bass,* 404 U.S. 336, 347–348, 92 S.Ct. 515, 522–523, 30 L.Ed.2d 488 (1972) (quoting H. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes,* in *Benchmarks* 196, 209 (1967)). It takes no great leap to extend this "distinctive distaste" to preclude the possibility of a non-citizen "languishing in prison" for up to fifteen years when the government has informed him unequivocally that the maximum sentence is two years. *Cf.* 1 LaFave & Scott, *Substantive Criminal Law* § 2.2(d) at p. 108 (1986 & 1993 Pocket Part) ("One modern reason for the rule of strict construction is said to be that criminals should be given fair warning, before they engage in a course of conduct, as to what conduct is punishable and *how severe the punishment is.*") (emphasis added).

## V. *Entrapment and Public Policy Limitations on Judicial Enforcement of the Criminal Law*

 There are two well-established theories of the entrapment defense. One, which remains the controlling view of the Supreme Court, is rooted in statutory interpretation and holds that "Congress could not have intended punishment for a defendant who has committed all of the elements of a proscribed offense, but was induced to commit them by the government." *United States v. Russell,* 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973) (summarizing and reaffirming majority view first adopted in *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), and affirmed in *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958)). The other view is based not on legislative intent, but instead on considerations of public policy: in short, "courts must be closed to the trial of a crime instigated by the government's own agents." *Sorrells,* 287 U.S. at 459, 53 S.Ct. at 219 (Roberts, concurring). *See also Casey v. United States,* 276 U.S. 413, 421, 48 S.Ct. 373, 375, 72 L.Ed. 632 (1927) (Brandeis, dissenting); *Sherman,* 356 U.S. at 378–385, 78 S.Ct. at 823–827 (Frankfurter, Douglas, Harlan, Brennan, concurring); *Russell,* 411 U.S. at 436–450, 93 S.Ct. at 1645–1651 (Douglas, Brennan, Stewart, and Marshall, dissenting). This so-called Roberts–Frankfurter approach has "growing support," "is favored by a majority of the commentators, and is reflected in the entrapment defense appearing in the American Law Institute's Model Penal

Code." 1 LaFave & Scott, *Substantive Criminal Law* § 5.2(c) at pp. 600–601 (1986).

Although under the former approach it might reasonably be argued that Congress could not have intended that deportees re-entering the country be subject to the fifteen year maximum penalty of amended § 1326 when the INS specifically and erroneously kept informing them that the maximum penalty was still two years, a more compelling argument for limiting the Defendant's sentence in this and similar cases is made by applying the overarching policy considerations of the latter Roberts–Frankfurter approach.

 The focus of this latter approach is on the conduct of the government; its purpose is to "preserve the institutional integrity of the system of federal criminal justice." *Russell,* 411 U.S. at 441, 445, 93 S.Ct. at 1647, 1649 (Stewart, dissenting). According to Justice Frankfurter, "[t]he courts refuse to convict an entrapped defendant, not because his conduct falls outside the proscription of the statute, but because, even if his guilt be admitted, the methods employed on behalf of the Government to bring about his conviction cannot be countenanced." *Sherman,* 356 U.S. at 380, 78 S.Ct. at 824 (concurring opinion).

> Insofar as they are used as instrumentalities in the administration of criminal justice, the federal courts have an obligation to set their face against enforcement of the law by lawless means or means that violate rationally vindicated standards of justice, and to refuse to sustain such methods by effectuating them. They do this in the exercise of a recognized jurisdiction to formulate and apply 'proper standards for the enforcement of the federal criminal law in the federal courts,' *McNabb v. United States,* 318 U.S. 332, 341 [63 S.Ct. 608, 613, 87 L.Ed. 819] an obligation that goes beyond the conviction of the particular defendant before the court. Public confidence in the fair and honorable administration of justice, upon which ultimately depends the rule of law, is the transcending value at stake.

*Id. See also Sorrells,* 287 U.S. at 457, 53 S.Ct. at 218 (Roberts, concurring) ("The protection of its own functions and the preservation of the purity of its own temple belongs only to the court. It is the province of the court and of the court alone to protect itself and the government from the prostitution of the criminal law.").

This Court recognizes that the wrong committed by the government in this case is of a character entirely different than the lawless conduct which concerned Frankfurter and his colleagues in the entrapment cases. Recognizing this obvious distinction, however, does not in any way mitigate the conduct of the government in this case, and it does not counsel against the Court imposing a less dramatic remedy commensurate with the wrong.

As did Justice Roberts (concurring) in *Sorrells,* this Court borrows from the civil law the "invariable" principle that an "action must be abated if its basis is violation of the decencies of life, disregard of the rules, statutory or common law, which formulate the ethics of men's relations to each other." 287 U.S. at 455, 53 S.Ct. at 217. This Court refuses to impose a sentence that grossly exceeds that which the government specifically represented to the non-citizen Defendant—and countless others—as the maximum penalty he faced upon illegal re-entry to the United States. Imposing a term of incarceration in excess of two years would be to sanction an indefensible and inexcusable example of misinformation disseminated by the United States, and would expose this Defendant and others to a potential deprivation of liberty lasting seven and a half times longer than that which the government represented as the maximum term.

It bears repeating that this view "requires no statutory construction, and attributes no merit to a guilty defendant; but frankly recognizes the true foundation of the doctrine in public policy which protects the purity of government and its processes." *Sorrells,* 287 U.S. at 455, 53 S.Ct. at 217. And it should be obvious that this Court's "refusal to lend aid of the court's own processes to the consummation of a wrong" is in no way an "attempt to modify by judicial legislation the mandate of the statute as to the punishment to be

imposed after trial conviction [or a guilty plea]." *Id.* at 458, 53 S.Ct. at 217.

VI. *Sentencing Guidelines*

■ While this Court believes that the limitation imposed on the Defendant's sentence emanates from and is authorized by the due process and entrapment cases described above, the Court also concludes that the Sentencing Guidelines specifically allow for downward departures under these circumstances. 18 U.S.C. § 3553(b) states that a court may impose a sentence outside the range established by the applicable guideline if it finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into account by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." The gross negligence evinced in this case would have been inconceivable to the Sentencing Commission (as it is to this Court). There can be no doubt that it constitutes a mitigating circumstance sufficient to justify a downward departure under § 3553(b). Under 18 U.S.C. § 3553(a), in determining the particular sentence to be imposed, the Court is instructed to consider, inter alia, "(2) the need for the sentence imposed (A) ... to promote respect for the law." Although in most circumstances the imposition of a sentence of a particular length is linked to promoting the defendant's respect for the law, limiting the sentence in this case to two years promotes *governmental* respect for— and careful attention to changes in—the law. *See U.S. v. Crippen,* 961 F.2d 882, 884–885 (9th Cir.1992) (§ 3553(a) serves as a guide to "what constitutes a legitimate sentencing concern" cognizable as an aggravating or mitigating circumstance under § 3553(b)).

VII. *Conclusion*

"Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen.... Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example." *Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 575,

72 L.Ed. 944 (1928) (Brandeis, dissenting). The Court limits Defendant's sentence to two years despite the crime that he has committed, "in order to maintain respect for law; in order to promote confidence in the administration of justice; in order to preserve the judicial process from contamination." *Id.* at 484, 48 S.Ct. at 574.

IT IS SO ORDERED.