UNITED STATES of America

v.

Oracio ALTUVE, Bernardo Arturo Ossa, Julio Trejo, Defendants.

No. 92–155–CR–HIGHSMITH.

United States District Court, S.D. Florida.

Feb. 1, 1996.

Kendall Coffey, U.S. Attorney, Paul Pelletier, Asst. U.S. Attorney, Miami, FL, for Plaintiff.

Stephen J. Golembe, Miami, FL, for Defendants.

## ORDER

HIGHSMITH, District Judge.

THIS CAUSE came before the Court upon Defendants Oracio Altuve, Bernardo Arturo Ossa, and Julio Trejo's sealed motion to enforce plea agreement or withdraw guilty plea. The Court held an evidentiary hearing on this matter on December 8 and 15, 1995. Having received documentary and testimonial evidence, having heard arguments of counsel, and being otherwise fully advised in the premises, the Court has determined that the defendants' motion to enforce plea agreement and alternative motion to withdraw guilty plea should be denied.

## PROCEDURAL BACKGROUND

On March 12, 1992, the grand jury returned an indictment charging defendants Oracio Altuve, Bernardo Arturo Ossa, and Julio Trejo, along with co-defendants Francisco Quintana and Adolfo Altuve, with various drug-related offenses. On March 26, 1992, a superseding indictment was returned, adding a sixth defendant, Pedro Almeida. The charges contained in the superseding indictment are as follows:

Count I: Conspiracy to possess with intent to distribute cocaine, in violation of Title 21, United States Code, Section 846, as to all six defendants (Oracio Altuve, Bernardo Arturo Ossa, Julio Trejo, Francisco Quintana, Adolfo Altuve, and Pedro Almeida);

Count II: Possession with intent to distribute cocaine, in violation of Title 21, United States Code, Section 841(a)(1), as to all six defendants.

Count III: Conspiracy to import cocaine into the United States, in violation of Title 21, United States Code, Section 963, as to five of the defendants (Pedro Almeida was not charged in this count).

Count IV: Importation of cocaine into the United States, in violation of Title 21, United States Code, Section 952(a), as to the same five defendants charged in Count III.

Shortly after the return of the indictment and superseding indictment, all of the defendants, with the exception of Adolfo Altuve, were arrested.[1] After varying periods of pretrial detention, Oracio Altuve, Julio Trejo, Bernardo Arturo Ossa, and Francisco Quintana were released on bond. A release bond was set for Pedro Almeida, but not posted; hence, this defendant remained pretrial detained.

On January 4, 1993, the Court held a change of plea hearing for Pedro Almeida and Francisco Quintana. On that date, Almeida and Quintana entered into identical cooperating plea agreements with the government. Pursuant to the agreements, Almeida and Quintana each entered guilty pleas as to Count I of the superseding indictment (conspiracy to possess with intent to distribute cocaine), and the government stipulated to the dismissal of the remaining counts as to each defendant after sentencing. A sentencing date of March 5, 1993 was set by the Court at the conclusion of the change of plea hearing.[2]

Both Almeida's and Quintana's plea agreements include the following cooperation provisions:

3. The defendant agrees that he shall cooperate fully with the Office of the United States Attorney for the Southern District of Florida, the United States Drug Enforcement Administration (DEA), and such other law enforcement agencies as either of the foregoing may require, by:

(a) providing truthful information and testimony concerning illicit drug activity, or any other illegal acts, wherever located, and;

(b) appearing at such grand jury proceedings, hearings, trials, and other judicial proceedings as may be required by the Office of the United States Attorney for the Southern District of Florida.

4. The United States reserves the right to evaluate the nature and extent of the defendant's cooperation and to advise the court of the nature and extent of such cooperation at the time of sentencing. If, in the judgment of the United States Attorney's Office, the circumstances of the defendant's cooperation warrant a reduction below the level established by statute as minimum sentence and departure by the court from the guideline sentence, the government shall make a motion pursuant to Title 18, United States Code, Section 3553(e), or 5K1.1 of the Sentencing Guidelines, stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense.

The final paragraph in each of the agreements states:

10. This is the entire agreement and understanding between the United States and the defendant. There are no other agreements, promises, representations, or understandings.

On January 21, 1993, the Court held a change of plea hearing for Oracio Altuve,

---

1. Adolfo Altuve was placed in fugitive status on November 16, 1992.

2. As previously noted, the superseding indictment does not charge Pedro Almeida with the offenses listed in Counts III and IV (conspiracy to import and importation of cocaine). Curiously, the plea agreement for Pedro Almeida provides for dismissal of these counts at the time of sentencing, in addition to dismissal of Count II (possession with intent to distribute cocaine), the only other count in which Almeida was charged.

Bernardo Arturo Ossa, and Julio Trejo. On that date, these defendants entered into identical cooperating plea agreements with the government. Under the terms of the agreements, Altuve, Ossa, and Trejo each pled guilty to Count II of the superseding indictment (possession with intent to distribute cocaine), and the government stipulated to the dismissal of the remaining counts (Counts I, III, and IV) after sentencing. With the exception of the change regarding the count as to which the defendants pled guilty and which counts would be dismissed, Altuve's, Ossa's, and Trejo's plea agreements are also identical to Almeida's and Quintana's. Thus, paragraphs # 3, 4, and 10, cited above from Almeida's and Quintana's agreements, are found verbatim in Altuve's, Ossa's, and Trejo's agreements. The Court set the sentencing of these defendants for April 23, 1993. The earlier sentencing date of March 5, 1993 for Almeida and Quintana was reset for the latter date.

As previously noted, Pedro Almeida had remained pretrial detained due to his apparent inability to post the bond set by the Court. On April 13, 1993, the Court granted an agreed motion for reduction of bond, and Almeida was released. As the sentencing date approached, therefore, all five defendants who had appeared before the Court had been released on bond.[3]

A few days prior to the scheduled sentencing date, the parties filed a joint motion requesting a thirty-day continuance. The reason for the motion was that the defendants' activities with regard to the substantial assistance contemplated in their plea agreements were still ongoing and would not be completed prior to April 23, 1993. Sentencing was postponed until June 11, 1993. In the interim, on May 17, 1993, the Court granted an agreed motion to modify Oracio Altuve's conditions of release, permitting him to have contact with his son, the fugitive defendant, Alfredo Altuve.

On June 11, 1993, the defendants were sentenced as follows:

- Francisco Quintana: 188 months as to Count I of the superseding indictment (conspiracy to possess with intent to distribute cocaine);
- Pedro Almeida: 210 months as to Count I of the superseding indictment;
- Bernardo Arturo Ossa: 235 months as to Count II of the superseding indictment (possession with intent to distribute cocaine);
- Julio Trejo: 250 months as to Count II of the superseding indictment;
- Oracio Altuve: 292 months as to Count II of the superseding indictment.

On motion of the government, the Court dismissed the remaining counts of the superseding indictment as to each of the defendants. The government did not, however, make a motion for downward departure, pursuant to Section 5K1.1 of the Sentencing Guidelines, prior to sentencing.

As agreed by the parties, the Court directed each defendant to voluntarily surrender for service of their respective sentences in forty five days. On July 19, 1993, the parties filed a joint motion for continuance of the surrender date. The motion was based on the assertion that some of the activities pertaining to the defendants' continued assistance to the United States were still ongoing and would not be completed by the prescribed surrender date of July 26, 1993. Pursuant to the parties' joint request, the Court extended the surrender date to October 26, 1993.

Prior to that date, however, the government filed a sealed, ex parte motion to revoke bond. On October 15, 1993, pursuant to the government's motion, the Court issued arrest warrants for Oracio Altuve, Bernardo Arturo Ossa, Francisco Quintana, and Julio Trejo. In its motion, the government stated that Oracio Altuve and his son, the fugitive defendant, Adolfo Altuve, had been planning Oracio Altuve's, as well as Julio Trejo's and Bernardo Arturo Ossa's flight from the Court's jurisdiction prior to the October 26, 1993, surrender date. The source of the government's information regarding these plans was co-defendant Pedro Almeida, who claimed to have received a fraudulent passport from Ossa and told to be ready to

---

**3.** Throughout these proceedings, the sixth defen- dant, Alfredo Altuve, has remained a fugitive.

depart from South Florida on October 12, 1993, with Ossa and Trejo. Shortly after issuance of the warrants, Altuve, Ossa, Trejo, and Quintana were arrested and committed to the Bureau of Prisons to serve their respective sentences.[4]

Pedro Almeida remained free on bond. On October 25, 1993, the government and Almeida filed a joint motion for a ninety-day extension of Almeida's surrender date. The Court granted the joint motion, extending Almeida's surrender date to January 26, 1994. Subsequent motions, requesting further extensions to April 26, 1994, and July 26, 1994 were similarly granted. Almeida, however, did not surrender on the final appointed date. Thereafter, on July 28, 1994, the United States Marshals Service requested a bench warrant for Almeida's arrest, which was issued by the Court on August 16, 1994. As of the date of this order, Almeida has not been arrested.[5]

On January 19, 1995, the government filed a motion for reduction of sentence with respect to Francisco Quintana.[6] In its motion, the government stated that Quintana had cooperated by providing corroborative information against his co-defendants as well as providing historical information about illicit drug activity. The government's stated position was that Quintana had provided substantial assistance and recommended that his sentence be reduced from 188 months to 120 months. The Court granted the government's motion.

On September 26, 1995, Oracio Altuve, Bernardo Arturo Ossa, and Julio Trejo filed their sealed motion to enforce plea agreement or withdraw guilty plea. As exhibits to their motion, the defendants filed copies of correspondence between defense counsel and the United States Attorney's Office concerning the plea agreements.[7] An early letter, dated October 6, 1992, contains a proffer by Altuve, Ossa, and Trejo describing the assistance they were prepared to provide to the government in exchange for a negotiated plea. The remaining letters, which span the period from January 25, 1994 to July 27, 1995, memorialize the exchanges between defense counsel and the United States Attorney's Office concerning the filing of Rule 35 motions for reduction of the sentences of Altuve, Ossa, and Trejo. In the July 27, 1995, letter, the government states its final position that no Rule 35 motions would be filed on behalf of these defendants.

Altuve, Ossa, and Trejo claim that the plea agreements into which they entered, along with Quintana and Almeida, were "group cooperation agreements," whereby cooperation by one defendant would inure to the benefit of all. Altuve, Ossa, and Trejo point to the fact that Assistant United States Attorney Harry Wallace, who has represented the government in this case, filed a Rule 35 motion on behalf of Francisco Quintana, even though Quintana had provided no independent cooperation, but had simply benefitted from the cooperation of his co-defendants. Altuve, Ossa, and Trejo conclude that, pursuant to the "group agreement," they are equally entitled to the benefit conferred upon Quintana, and that Wallace's refusal to confer such benefit rises to the level of bad faith. The defendants also claim that Wallace acted in bad faith in the course of his exchanges with defense counsel regarding the filing of Rule 35 motions. Based on these contentions, the defendants have sought the Court's intervention, arguing that such conduct on the part of the government is unconscionable, and that they are entitled to judicial review of their

4. No mention is made in the government's motion regarding Francisco Quintana's involvement in the plans to abscond. Nevertheless, Quintana's name is included in the heading of the motion and the request for bond revocation refers to the defendants in general.

5. At the evidentiary hearing, the defendants introduced evidence concerning Almeida's allegedly "staged" murder, which has been investigated by state authorities. The Court has determined that these matters have no bearing on the issues before the Court. Interestingly, they may have

retrospectively impacted upon the government's assessment of Almeida's credibility.

6. The post-sentencing motion was made pursuant to *Fed.R.Crim.P.* 35(b), rather than Section 5K1.1 of the Sentencing Guidelines, which contemplates motions prior to imposition of sentence.

7. Copies of the majority of these letters were also introduced as exhibits to the evidentiary hearing held in December, 1995.

sentences, or, in the alternative, to withdraw their guilty pleas.

## FACTUAL FINDINGS

Having reviewed the documentary and testimonial evidence presented by the parties in connection with this matter, the Court finds as follows, by a preponderance of the evidence.

1. As must be evident from the Court's thorough review of the procedural background in this case, there was cooperation between *all* parties, at least initially. The government and the defendants filed joint or agreed motions for postponement of sentencing, for reduction of Almeida's bond, and even for modification of the release conditions with respect to Oracio Altuve. The latter was unusual in that it permitted Altuve to make contact with a fugitive defendant in the same case, Aldolfo Altuve, Oracio's son.

2. In allowing Oracio Altuve to have contact with Adolfo, the government, in effect, permitted a fugitive defendant to supply information through his father apparently in an effort to help his father qualify for a finding of "substantial assistance."

3. By adopting such a posture, the government *encouraged* and *allowed* the defendants to make the most of their chance to qualify for the government's largesse through cooperation.

4. With regard to the defendants' contention that, pursuant to the plea agreements, cooperation by one defendant would inure to the benefit of all, the Court finds credible the testimony of John May, former counsel for defendant Julio Trejo, stating that this was his understanding of the plea agreements. Nothing in the written plea agreements, however, supports such a construction. Indeed, paragraph # 10 of the agreements explicitly states, "There are no other agreements, promises, representations, or understandings."

5. With respect to the government's conduct in connection with the defendants' repeated requests that the government file Rule 35 motions on their behalf, a review of

the documentary and testimonial evidence leads the Court to the conclusion that the government's representatives exhibited a rather cavalier attitude in their dealings with defense counsel. In this regard, the Court finds quite credible the testimony of defense attorney Patricia Jean Kyle, that, at one point, she was led to believe that a decision affirming "substantial assistance" had been made and that appropriate motions would be forthcoming on behalf of the defendants. The Court also finds that, in some measure, the testimony of Assistant United States Attorney Wallace corroborated, rather than contradicted, Kyle's testimony.[8]

6. The Court, also, finds credible the testimony that AUSA Wallace verified that "substantial assistance" had been rendered by the defendants. However, the Court is unable to find that his concomitant determination that such assistance was compromised by the defendants' plot to abscond, was made in bad faith.

7. Thus, while this case demonstrates the rather cavalier attitude displayed by government representatives toward contracts (agreements) of this nature, this Court is unable to conclude that defendants have met their burden of establishing by a preponderance of the evidence that:

A. It was agreed that, if one (Quintana) was accorded the benefit of a "substantial assistance" determination, all defendants should be granted such determination.

B. There was "substantial assistance" rendered by each defendant. Even if the Court disagreed with the government's conclusion, reasonable men could differ and the Court, must, therefore, accede to the government's decision.

C. The Office of United States Attorney failed to exercise good faith in its determination not to file Rule 35 motions on behalf of Oracio Altuve, Bernardo Arturo Ossa, and Julio Trejo.

8. The Court *does not impute perjury to* any witness; however, the Court finds the testimony of the case agent, James Rankin,

---

**8.** The Court would be remiss if it failed to observe that Mr. Wallace's professionalism, in his failure to timely respond to the numerous inquiries by Ms. Kyle, leaves something to be desired.

less than candid, insofar as said testimony related to the "fruits" of the information furnished to him by the defendants and their counsel.[9] Further, it appeared to the Court that the agent was less well-informed than one might expect from a "lead" agent. Agent Rankin's conduct, however, does not rise to the level of bad faith.

## DISCUSSION

Once again, this Court is called upon to review and decide the merits of a dispute, arising out of a contract (plea agreement) between the United States and a defendant (here, three) who has by plea of guilt been convicted of a crime. In *United States v. Ganz,* 806 F.Supp. 1567 (S.D.Fla.1992), the undersigned undertook such a task upon the defendant's filing of a motion to compel specific performance of a cooperation plea agreement. The Court granted the defendant's motion to compel and ordered the government to file a motion for downward departure, pursuant to Section 5K1.1 of the Sentencing Guidelines. In that case, after conducting an extensive evidentiary hearing, the Court found that Defendant Ernest Ganz had complied with every provision of the plea agreement and had done all that was requested of him without reservation. The Court further found that the government had acted in bad faith through the unilateral decision by the Assistant United States Attorney in charge of the case not to file a substantial assistance motion on behalf of Ganz.[10]

 The legal standards applied by the Court in *Ganz* are equally applicable to this case. "When a guilty plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *United States v. Rewis,* 969 F.2d 985, 988 (11th Cir.1992)

(quoting *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971)). In *Ganz,* this Court would not condone the government's bad faith refusal to honor its promise. In similar circumstances, the Court would not hesitate in doing so again. The facts presented by this case, however, do not support a finding of bad faith on the part of the government. This case is in the opinion of the Court, *borderline* and demonstrates the necessity that counsel must be ever alert to cross all the "t"s and dot all the "i"s in the negotiation and preparation of plea agreements.

As is often the case in typical contract disputes, two "agreements" are in issue: (1) the one contemplated and, perhaps, inferred from the negotiating process, and (2) the one reduced to writing and executed by the parties. Unfortunately, the niceties of "civil" contract construction are seemingly ignored in the criminal justice process.[11] It is obvious to the Court what all, except, perhaps, one (the government's representative) perceived to be the "centerpiece" of the agreement; i.e., substantial assistance by one equates to substantial assistance by all. The explicit language contained in paragraph # 10 of the agreements, however, may not be ignored. Paragraph # 10 states, in very clear language, "This is the entire agreement and understanding between the United States and the defendant. There are no other agreements, promises, representations, or understandings." Had defense counsel been more punctilious in the exercise of their duties, they would have insisted in the inclusion of language reflecting their understanding that the agreements were "group agreements" and that cooperation by one defendant would inure to the benefit of all. The plea agreements, however, include no such language and explicitly exclude any side agreements. Therefore, the defendants

---

**9.** Defense attorneys Joaquin Fernandez and Patricia Kyle both testified that they served as conduits of information from the defendants and/or their sources to Agent Rankin.

**10.** In this regard, the Court heard and found credible the testimony of the case agent, who was of the opinion that Ganz had rendered substantial assistance to the government. The Assistant

United States Attorney, however, did not solicit the agent's opinion in making his decision not to file a 5K1.1 motion.

**11.** For example; mutuality of obligation; novation; substantial performance (not to be confused with "substantial assistance"); and, reformation.

must live with the bargain they struck with the government.[12]

This said, the Court must again emphasize the government's responsibility to act in *utmost* good faith in its dealings with common people. The Court finds this requirement most clearly and succinctly expressed by Judge Clark in *United States v. Forney*, 9 F.3d 1492 (11th Cir.1993) (Clark, J., dissenting):

> I would apply traditional contract principles and impose upon the government the duty of good faith and fair dealing. I would hold that, when a cooperation agreement retains for the government the sole discretion to determine whether a 5K1.1 motion is appropriate, a district court is authorized to review the government's decision to ensure that it was rendered in good faith.

*Id.* at 1508.

In this case, the Court has scrutinized the government's conduct and found it to fall, albeit by a narrow margin, within the bounds of good faith and fair dealing. The government, however, *can* and *must* do a better job than this record shows at "turn[ing] square corners in dealing with the people." *Ganz*, 806 F.Supp. at 1575 (quoting *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229, 82 S.Ct. 289, 301, 7 L.Ed.2d 240 (1961) (Black, J., dissenting)).

### CONCLUSION

Based on the foregoing considerations, it is hereby

ORDERED AND ADJUDGED that Defendants Oracio Altuve, Bernardo Arturo Ossa, and Julio Trejo's sealed motion to enforce plea agreement and alternative motion to withdraw guilty plea are DENIED.

DONE AND ORDERED.

---

**12.** Further in this regard, the Court finds no support in the text of the agreements or in the evidentiary record for the defendants' alternative motion to withdraw their guilty pleas, which is, in essence, a motion to void the agreements.