Julio **TREJO,** Movant,

v.

**UNITED STATES of America,**
**Respondent.**

Oracio Altuve, Movant,

v.

United States of America, Respondent.

Bernardo Arturo Ossa, Movant,

v.

United States of America, Respondent.

Nos. 96–2698CIV., 96–2699CIV.,
96–2697CIV.

United States District Court,
S.D. Florida.

April 29, 1999.

Paul Pelletier, Assistant United States Attorney, Miami, FL, for plaintiffs.

Patricia Jean Kyle, Bozeman, Montana, Stephen Golembe, Coconut Grove, FL, for defendants.

## MEMORANDUM OPINION

HIGHSMITH, District Judge.

### GRANTING MOTIONS FILED PURSUANT TO 28 U.S.C. § 2255

THESE CAUSES came before the Court upon three separate Reports issued by Magistrate Judge Lurana S. Snow, recommending that Julio Trejo's, Oracio Altuve's and Bernardo Arturo Ossa's respective motions to vacate, set aside, or correct sentence, filed pursuant to 28 U.S.C. § 2255, be granted. Having conducted a *de novo* review of this matter, including consideration of the evidentiary record developed by Magistrate Judge Snow, pertinent portions of the record in the underlying criminal action (Case No. 92–155–CR–HIGHSMITH), the government's omnibus objections to Magistrate Judge Snow's Reports, and the movants' consolidated response to said objections, the Court agrees with Magistrate Judge Snow's conclusion that all three motions should be granted. Because events, very disturbing to the Court, are now known to have transpired in the criminal proceedings, the undersigned issues his own Memorandum Opinion, incorporating, as appropriate, portions of Magistrate Judge Snow's Reports.[1]

1. Magistrate Judge Snow issued identical reports in each of the three above-styled cases. For ease of reference, the Court cites to portions of the Report and Recommendation issued in Case No. 96–2697, rather than to all three.

2. This Procedural Background is essentially taken from the Procedural History Section

## PROCEDURAL BACKGROUND [2]

On March 12, 1992, an indictment was returned charging Oracio Altuve, Bernardo Arturo Ossa and Julio Trejo, along with co-defendants Francisco Quintana and Adolfo Altuve, with violating the federal narcotics laws. On March 26, 1992, a superseding indictment was returned, adding a new defendant; Pedro Almeida. The superseding indictment charged all defendants with conspiracy to possess with intent to distribute cocaine and possession of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 846 and 841(a)(1) (Counts I and II). In addition, all defendants except Almeida were charged with conspiracy to import and importation of cocaine, in violation of 21 U.S.C. §§ 963 and 952(a) (Counts III and IV).

All of the defendants except Adolfo Altuve (the son of defendant Oracio Altuve) were arrested or surrendered; Adolfo Altuve was placed in fugitive status. All of the defendants who appeared eventually posted bond. On January 4, 1993, Pedro Almeida and Francisco Quintana entered guilty pleas to Count I, charging conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846. On January 21, 1993, defendants Ossa, Trejo and Oracio Altuve entered guilty pleas to the same conspiracy count.

All five defendants agreed to cooperate with the Government, pursuant to identical written plea agreements. Each agreement contained the following language, which was standard for plea agreements requiring cooperation:

3. The defendant agrees that he shall cooperate fully with the Office of the United States Attorney for the Southern District of Florida, the United States

found at pages 1 through 7 of Magistrate Judge Snow's Report and Recommendation. However, the undersigned has deemed it appropriate to include additional procedural facts, which have retrospectively become highly relevant as a result of the evidentiary proceedings held before Magistrate Judge Snow.

Drug Enforcement Administration (DEA), and such other law enforcement agencies as either of the foregoing may require, by:

(a) providing truthful information and testimony concerning illicit drug activity, or any other illegal acts, wherever located, and

(b) appearing at such grand jury proceedings, hearings, trials, and other judicial proceedings as may be required by the Southern District of Florida.

4. The United States reserves the right to evaluate the nature and extent of the defendant's cooperation and to advise the court of the nature and extent of such cooperation at the time of sentencing. If, in the judgment of the United States Attorney's Office, the circumstances of the defendant's cooperation warrant a reduction below the level established by statute as minimum sentence and departure by the court from the guidelines sentence, the government shall make a motion pursuant to Title 18, United States Code, Section 3553(e), or 5K1.1 of the Sentencing Guidelines, stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense.

\* \* \* \* \* \*

10. This is the entire agreement and understanding between the United States and the defendant. There are no other agreements, promises, representations, or understandings.

The sentencing of all five defendants was postponed from April 23, 1993, until June 11, 1993, based on a joint motion for continuance, which recited that the defendants' cooperation was still ongoing and would not be completed in time for the April sentencing date. Additionally, on May 17, 1993, the Court modified the bond of Oracio Altuve to permit him to have contact with his fugitive son, Adolfo Altuve. The sentencing did take place as scheduled on June 11, but the Government did not file any motion seeking a downward departure from the mandatory minimum sentence or the Sentencing Guidelines range applicable to the respective defendants.

Accordingly, each of the defendants was sentenced within the Guidelines range applicable to him. Quintana received a prison term of 188 months; Almeida's prison term was 210 months; Ossa's term was 235 months; Trejo received 250 months; and Oracio Altuve was sentenced to 292 months. Pursuant to the agreement of the parties, each defendant was permitted to voluntarily surrender in forty-five days. On July 19, 1993, the parties filed a joint motion for continuance of the surrender date, based on the fact that the still ongoing cooperation would not be concluded by July 26, the initial date on which the defendants were to surrender. The motion was granted, and the surrender date was extended to October 26, 1993.

Prior to that date, however, the Government filed a sealed, *ex parte* motion to revoke the bonds of all defendants except Almeida. The motion recited that Oracio Altuve and his fugitive son had been planning the flight of Oracio Altuve, Trejo and Ossa. The source of this information, co-defendant Almeida, made no mention of Quintana. Nevertheless, Quintana was arrested along with the others. Almeida, who was not arrested, obtained several extensions of his own surrender date. When he failed to surrender as required on July 26, 1994, a bench warrant was issued for his arrest, but the warrant has not been executed.[3]

---

**3.** The defendants presented evidence at a prior hearing held before the undersigned, regarding Altuve, Ossa and Trejo's motion to enforce plea agreement, that Almeida staged certain events to make it appear that he had been murdered. As pointed out in the undersigned's February 1, 1996, order denying the motion to enforce plea agreement, these events may cast doubt on the veracity of the information provided by Almeida on the alleged flight plans of his co-defendants. *See United States v. Altuve,* 915 F.Supp. 370, 373 n. 5 (S.D.Fla.1996).

On January 19, 1995, the Government filed a motion for reduction of Quintana's sentence, pursuant to Fed.R.Crim.P. 35(b). The motion recited that Quintana had provided corroborative information against his co-defendants, as well as historical information regarding illicit drug activities. The Government's evaluation was that the assistance provided by Quintana was substantial, and recommended a reduction in his prison term from 188 to 120 months. This motion was granted.

On September 26, 1995, defendants Trejo, Ossa and Oracio Altuve jointly filed a sealed motion to enforce plea agreement, or be allowed to withdraw their respective guilty pleas. Attached to the motion were copies of correspondence between defense counsel and the prosecutor pertaining to the defendants' cooperation and the filing of a Rule 35 motion for reduction of their sentences. In the last letter, dated July 27, 1995, the prosecutor announced his final decision that no Rule 35 motion would be filed.

In their motion to enforce plea agreement, Trejo, Ossa and Oracio Altuve argued that all five defendants had entered into an agreement which contemplated joint cooperation, whereby the efforts of one defendant would inure to the benefit of all. They contended that each was entitled to the same benefit as had been afforded to defendant Quintana, and that the prosecutor's failure to file motions on behalf of all non-fugitive defendants constituted bad faith.

The undersigned conducted an extensive evidentiary hearing on the joint motion to enforce plea agreement. At that hearing, the Court received the testimony of defense attorneys Jon May and Patricia Jean Kyle, Assistant United States Attorney Harry Wallace, and United States Customs Service Agent James Rankin. After careful evaluation of the evidence presented, the undersigned found that the Government's conduct fell within the bounds of good faith and fair dealing, "albeit by a narrow margin." *See United States v. Al-*

*tuve,* 915 F.Supp. 370, 376 (S.D.Fla.1996). In reaching this conclusion, however, the undersigned found that the prosecutor's conduct was less than professional and the case agent's testimony was less than candid. With regard to the conduct of defense counsel, the undersigned noted:

Had defense counsel been more punctilious in the exercise of their duties, they would have insisted in (sic) the inclusion of language reflecting their understanding that the agreements were 'group agreements' and that cooperation by one defendant would inure to the benefit of all. The plea agreements, however, include no such language. And explicitly exclude any side agreements. Therefore, the defendants must live with the bargain they struck with the government.

*Id.* at 375–76. Additionally, the undersigned noted that the Government can and must do a better job than was done in this case in its dealings with common people. *Id.* at 374–76.

After the denial of their motion to enforce plea agreement, Trejo, Ossa and Oracio Altuve filed identical motions to vacate, set aside or correct sentence, pursuant to 28 U.S.C. Section 2255. The movants contend that they received ineffective assistance of counsel throughout the plea and sentencing process. An evidentiary hearing was held before Magistrate Judge Snow on February 9 and 10, and August 26, 1998. In those proceedings, the parties stipulated to the testimony adduced before the district court at a prior hearing on the motion to enforce plea agreement and called additional witnesses.[4]

Enlightened by the evidence presented before Magistrate Judge Snow, particularly, the testimony of Trejo, Ossa and Oracio Altuve, the undersigned has conducted a review of the record in Case No. 92–155–CR–HIGHSMITH. As a result of this review, the misgivings expressed by the undersigned in the February 1, 1996, order denying the motion to enforce plea agree-

---

4. Magistrate Judge Snow's Procedural History ends at this juncture.

ment have now crystalized. Hence, the undersigned finds it appropriate to include in this Memorandum Opinion the following procedural facts, which were not specifically recited in Magistrate Judge Snow's Report.

As previously noted, the original indictment in this action, charging Oracio Altuve, Bernardo Arturo Ossa and Julio Trejo, along with co-defendants Francisco Quintana and Adolfo Altuve, with violating the federal narcotics laws, was returned on March 12, 1992. On March 26, 1992, the superseding indictment adding co-defendant Pedro Almeida was returned.

Oracio Altuve was arrested and appeared on the charges contained in the original indictment on March 17, 1992, at which time he was not represented by counsel. At a second appearance on March 20, 1992, Altuve reported that he had not yet retained counsel. Therefore, the matter was continued to March 27, 1992. At that third hearing, Joaquin Fernandez entered a notice of permanent appearance as counsel of record for Altuve, who was then arraigned on the original indictment and subjected to temporary pretrial detention, pending a hearing. The notice reflected Fernandez's business address as 2601 So. Bayshore Drive # 1400, Coconut Grove, Florida, and his telephone number as 858–5300. Thereafter, on April 2, 1992, Altuve was arraigned on the superseding indictment and was ordered detained pending trial. On motion for reconsideration, Altuve was granted bond by Magistrate Judge Ted E. Bandstra on April 29, 1992. Unable to post the required amount, Altuve subsequently moved for reduction of bond, which was granted by the undersigned. On November 10, 1992, Altuve was released pending trial.

On March 17, 1992, Pedro Almeida was arrested on a criminal complaint and appeared before the duty magistrate judge, where he was represented by the Office of the Federal Public Defender.[5] On March

20, 1992, Almeida was ordered pretrial detained, but three days later, bond was set. On March 27, 1992, Almeida was arraigned on the superseding indictment. On August 13, 1992, while still represented by AFPD Paul Korchin, Almeida moved for reduction of bond, which was granted on September 9, 1992. Still unable to meet the lower bond amount and collateral conditions, Almeida filed agreed motions for further reduction of bond on January 21, 1993 (after having changed his plea to guilty on January 4, 1993) and April 13, 1993, at which time he was finally released, pending sentencing.

On April 14, 1992, Bernardo Arturo Ossa was arrested and arraigned on the charges contained in the superseding indictment and was ordered released on bond pending trial. On that date, Frank Rubino entered a notice of permanent appearance as counsel of record for Ossa. The notice reflected Rubino's business address as: 2601 So. Bayshore Drive, Coconut Grove, Florida, and his telephone number as 858–5300. Ossa posted the required bond, which was approved by Magistrate Judge Barry L. Garber on April 16, 1992, resulting in Ossa's release.

On April 30, 1992, Julio Trejo surrendered and appeared on the charges contained in the superseding indictment. On that date, Frank Rubino entered a notice of temporary appearance on behalf of Trejo and filed a motion for bond, which was granted, resulting in Trejo's immediate release. On May 4, 1992, Trejo was arraigned, at which time Jon May entered a notice of permanent appearance as counsel of record for Trejo. The notice reflected May's business address as 155 S. Miami Avenue, Penthouse 1, Miami, Florida.

On July 24, 1992, Francisco Quintana surrendered, appeared on the charges contained in the superseding indictment and was released on bond pending trial. At that time, John Rodriguez appeared as temporary counsel and three days later

---

5. This representation lasted until December 28, 1992, at which time Ruben Oliva entered a notice of appearance as retained counsel for Almeida.

filed a notice of permanent appearance as counsel of record for Quintana.

During the month of January, 1993, all five defendants changed their respective pleas to guilty, pursuant to the cooperation plea agreements fully discussed above. At the combined change of plea hearing for Altuve, Ossa and Trejo held before the undersigned on January 21, 1993, Joaquin Fernandez announced his appearance as follows: "Good afternoon, Your Honor. Joaquin Fernandez for Mr. Altuve, and I am also standing in for Mr. Frank Rubino who represents Mr. Ossa." *See* Transcript of Plea Hearing, held on January 21, 1993, at 2. The Court then engaged in the following colloquy:

> THE COURT: And I also [note], although I know it's already been noted for the record, Mr. Fernandez, you are standing in in substitution for Mr. Rubino for this proceeding?
>
> MR. FERNANDEZ: That's correct, Your Honor.
>
> THE COURT: Mr. Ossa ... Do you have any objection to proceeding in the absence of Mr. Rubino and allowing Mr. Fernandez to represent you for the purpose of this specific proceeding?
>
> MR. OSSA: No. It's all right.
>
> THE COURT: No objection?
>
> MR. OSSA: No objection, Your Honor.

*Id.* at 3. A review of the signatures in Ossa's plea agreement reveals that, although the printed name of Frank Rubino is shown as attorney for the defendant, Rubino did not sign the agreement. Rather, Joaquin Fernandez did, with the notation "for" next to Rubino's name.[6]

On March 11, 1993, the Court held a hearing to address a petition by Pretrial Services, requesting amendment of the conditions of release imposed upon Julio Trejo to include electronic monitoring. Neither Trejo nor his counsel, Jon May, appeared at the hearing. In response to a Rule to Show Cause issued by the undersigned, May stated, *inter alia*, that due to a delay in the readiness of his new office quarters, he "had been forced to conduct his practice out of the library at attorney Frank A. Rubino's office." *See* Response to Rule to Show Cause, dated March 11, 1993. On his submission, May showed his business address as 2601 South Bayshore Drive, Suite 1400, Coconut Grove, Florida, and his telephone number as 858–5300.[7] This address and telephone number are the same as those indicated by both Rubino and Fernandez in their various submissions to the Court.

On April 19, 1993, Jon May signed the objections to the Presentence Investigation Report, which had been nominally submitted by Rubino on behalf of Ossa. On that same date, May submitted objections to the Presentence Investigation Report on behalf of his own client, Julio Trejo. Curiously, Ossa's and Trejo's respective submissions each include objections made by "both" defendants and use the pronoun "we" instead of "I". Indeed, the two submissions read almost identically, except for a few comments that are obviously applicable to only one of the defendants. Also on April 19th, May filed a joint motion for continuance, on behalf of all five defendants, of the combined sentencing hearing which had been scheduled for April 23, 1993. The motion was granted and the hearing was reset to June 11, 1993. Then, on April 26, 1993, May and Rubino filed a stipulation for substitution of counsel, which was approved by the undersigned, resulting in May becoming counsel of record for Ossa. With the benefit of hindsight, the undersigned has concluded that further inquiry would have been appropriate prior to authorizing the substitution, or,

---

6. The Court has reached this obvious conclusion by comparing the signature on the plea agreement with the signatures of Frank Rubino and Joaquin Fernandez that appear in various other documents in the record of Case No. 92–155–CR–HIGHSMITH.

7. In moving to Rubino's office, May appears to have discontinued using the telephone number associated with his prior office address, 372–8860.

alternatively, at the outset of the sentencing hearing, where May appeared on behalf of both Trejo and Ossa. Had such an inquiry been conducted, the true state of affairs with respect to defendants' representation, which was revealed during the evidentiary proceedings before Magistrate Judge Snow, might have come out sooner. It is regrettable that it has taken this long and that so much judicial effort has been consumed, to finally bring to light the "behind the scenes" conduct of counsel in the criminal proceedings involving Ossa, Trejo and Altuve, particularly that of Ossa's counsel of record, Frank Rubino, Esq.

### FACTUAL FINDINGS

Pursuant to the parties' stipulation, Magistrate Judge Snow adopted the factual findings contained in the undersigned's February 1, 1996, order denying the motion to enforce plea agreement. In addition, Magistrate Judge Snow made factual findings and credibility assessments based on the testimony presented before her. Having reviewed the transcripts of the evidentiary hearing conducted by Magistrate Judge Snow, the undersigned concurs with and adopts her assessment that the testimony of all three movants was credible. Magistrate Judge Snow's factual findings and credibility assessments are summarized below.

I. Pertinent factual findings specifically adopted by Judge Snow from the undersigned's February 1, 1996, order denying the motion to enforce plea agreement:

1. As must be evident from the Court's thorough review of the procedural background in this case there was cooperation between *all* parties, at least initially. The government and the defendants filed joint or agreed motions for postponement of sentencing, for reduction of Almeida's bond, and even for modification of the release conditions with respect to Oracio Altuve. The latter was unusual in that it permitted Altuve to make contact with a fugitive defendant in the same case, Adolfo Altuve, Oracio's son.

2. In allowing Oracio Altuve to have contact with Adolfo, the government, in effect, permitted a fugitive defendant to supply information through his father apparently in an effort to help his father qualify for a finding of "substantial assistance."

3. By adopting such a posture, the government encouraged and allowed the defendants to make the most of their chance to qualify for the government's largesse through cooperation.

4. With regard to the defendants' contention that, pursuant to the plea agreements, cooperation by one defendant would inure to the benefit of all, the Court finds credible the testimony of Jon May, former counsel for defendant Julio Trejo, stating that this was his understanding of the plea agreements. Nothing in the written plea agreements, however, supports such a construction. Indeed, paragraph # 10 of the agreements explicitly states, "There are no other agreements, promises, representations, or understandings."

5. With respect to the government's conduct in connection with the defendants' repeated requests that the government file Rule 35 motions on their behalf, a review of the documentary and testimonial evidence leads the Court to the conclusion that the government's representatives exhibited a rather cavalier attitude in their dealings with defense counsel. In this regard, the Court finds quite credible the testimony of defense attorney Patricia Jean Kyle, that, at one point, she was led to believe that a decision affirming "substantial assistance" had been made and that appropriate motions would be forthcoming on behalf of the defendants. The Court also finds that, in some measure, the testimony of Assistant United States Attorney Wallace corroborated, rather than contradicted, Kyle's testimony.

6. The Court, also, finds credible the testimony that AUSA Wallace verified that "substantial assistance" had been

rendered by the defendants. However, the Court is unable to find that his concomitant determination that such assistance was compromised by the defendants' plot to abscond, was made in bad faith.

*See United States v. Altuve,* 915 F.Supp. 370, 374 (S.D.Fla.1996).

II. Summary of facts adduced before Magistrate Judge Snow:

*1. Testimony of Julio Trejo:* Trejo stated that he has known attorney Joaquin (Jack) Fernandez for fifteen years or more, and met with Fernandez the day before he surrendered. Fernandez told Trejo that he was going to get another lawyer, Jon May, to represent Trejo because each one of them had to have his own lawyer. Trejo retained Jon May through Fernandez.

After he was released from jail, Trejo met with May, Fernandez and co-defendant Ossa at Fernandez' office to discuss their cooperation. Ossa was represented by Frank Rubino, but Rubino was not at the meeting. According to Trejo, Fernandez said that Rubino was withdrawing because he would not represent anyone who worked for the Government.

Trejo heard about a meeting with AUSA Wallace that was attended by May, Fernandez, Ossa and Oracio Altuve. Trejo was not at this meeting and did not find out about it until a few days later. Trejo stated that he had never discussed with Fernandez or May the possibility of either of them representing Ossa. Trejo explained that May was supposed to be representing him, since it was Trejo who was paying him.

Trejo testified that the cooperation agreement made by Fernandez with AUSA Wallace was that the cooperation of one defendant would be good for all of them. However, this provision was not in the written plea agreement, which Fernandez translated for him. Trejo said something to Fernandez about the omission, but Fernandez told him not to worry because it all had been arranged. Jon May said the same thing, with Fernandez acting as his interpreter. Rubino was not present at any of the approximately five meetings that took place in Fernandez' office prior to the plea, but May attended all of them.

At the change of plea hearing, Trejo was upset about May defending Ossa. Trejo remained free on bond after the guilty plea. He reviewed the PSI and conferred with Fernandez and May. Prior to sentencing, Trejo discussed with May his concerns about May's representation of Ossa, but there was no discussion of a conflict. Trejo had no knowledge that May had been substituted as counsel for Ossa until the day of sentencing. After sentencing, Trejo saw May on two or three occasions. Finally, Trejo stated unequivocally that he would not have pleaded guilty if he had known that the group cooperation agreement was not enforceable.

*2. Testimony of Bernardo Arturo Ossa:* Ossa stated that initially he had been represented by Frank Rubino. Ossa met with Rubino about a week before his surrender, and next saw him on the day of Ossa's bond hearing. Subsequently Ossa met with Rubino when he obtained discovery, and they discussed the tape transcripts. There were two or three additional meetings with Rubino after that, and Rubino told Ossa that he would find out if there was any additional proof of the charges.

Prior to October 6, 1992, Ossa talked with Jack Fernandez about cooperation. Ossa told Fernandez what he could do for the Government. Later there was a meeting with the AUSA and the agent, at which Fernandez and Jon May also were present. Ossa had not discussed this meeting with Rubino and did not know why Rubino did not attend.

Sometime around December 1992, there was a meeting in Key Largo after Oracio Altuve was released from jail. Altuve told Ossa to come over and wait for a telephone call. Then Fernandez showed up and stated that he was taking Altuve to meet with Rankin and another agent in Key Largo. At Fernandez' suggestion, Ossa went with

them, and told Agent Rankin everything he knew. Rubino was not there, and Ossa never talked to him about this meeting.

There was another meeting to discuss their plea agreement. Ossa, Trejo and Oracio Altuve were present, as were May and Fernandez. Rubino did not attend, and Fernandez told Ossa that Rubino would not represent people who cooperate with the Government. When the lawyers reviewed the terms of the plea agreement with the defendants, Altuve and Trejo asked why the "one for all and all for one" language was not in the plea agreement. Fernandez told them not to worry about it, but the defendants asked him to get this on paper if he could.

Ossa testified that Rubino was not in court at the time of Ossa's plea. Ossa had not spoken to Rubino and did not know where he was. Either May or Fernandez represented Ossa during the plea, but neither lawyer told Ossa that they would continue this representation through sentencing. Ossa stated that he believed the sentence would be ten years, that there would be a reduction when the time came. Otherwise, Ossa did not believe he would have signed the agreement.

Ossa recalled another meeting at which his PSI was discussed. All three defendants were present, as were May and Fernandez. Once again, Rubino did not attend. However, no one ever told Ossa that Rubino had withdrawn from the case. Ossa never retained Fernandez or May, or asked either one to represent him. Finally, no one ever discussed with Ossa the concept of conflict of interest or the issue of whether each defendant should have his own lawyer.

Ossa recalls seeing the objections to his PSI that were filed, but does not remember who signed the pleading. He did not discuss the PSI with Rubino, and none of the lawyers explained to him the Sentencing Guidelines computation contained in the PSI. Ossa stated that he expected Rubino to be at sentencing, since he had never consented to Rubino's withdrawal or to representation by any other lawyer.

When Ossa was sentenced to 235 months, he thought there still was an agreement to file a Rule 35 motion when their cooperation was finished, since this is what Fernandez had told him prior to sentencing.

Ossa stated that, at the change of plea hearing, he had told the undersigned that he had read the plea agreement, and that he was pleading guilty because he understood from his lawyer that it was better for him to do so. Ossa explained that he was referring to Rubino, who was not there. Ossa acknowledged that he never discussed pleading guilty with Rubino. It was one of the other lawyers who told Ossa that Rubino did not represent people who cooperate, but Ossa did not believe that Rubino was no longer his lawyer. However, Ossa never saw Rubino again. Nevertheless, during the plea colloquy, Ossa told the Court that he did not object to proceeding without his lawyer and to having Fernandez represent him. Later, when he told the Court that he had fully discussed the contents of the indictment with his lawyer and was satisfied with counsel's services, Ossa knew the judge was talking about Rubino. In addition, Ossa informed the Court that he had discussed the plea agreement with his lawyer and had no questions about any provision of the plea agreement. According to Ossa, he answered this way because he thought the judge knew about "one for all and all for one," even though none of the attorneys had told him that the judge knew about this. Lastly, Ossa told the Court that he had discussed the Sentencing Guidelines with his lawyer.

Ossa stated that he had tried to call Rubino, but never was able to talk to him. He put his trust in Rubino, since that is what he paid Rubino for. Ossa explained that he had been nervous before the undersigned, but had understood what he was being asked. He thought he was acting in his best interest, and does not know why he did not tell the Court about the group cooperation.

*3. Testimony of Oracio Altuve:* Altuve retained Jack Fernandez as his attorney in magistrate's court. Fernandez told Altuve that he was going to get him out of "this mess". Following his release on bond, Altuve attended a meeting with AUSA Wallace and Agent Rankin. Ossa and Almeida also were present, as were attorneys Fernandez, May and Ruben Oliva. Frank Rubino did not attend, nor did codefendant Quintana. At the meeting, they talked about reaching an agreement with the Government to help themselves. Altuve stated that he thought everything would be all right, if what was said was implemented.

Altuve testified that he had attended two meetings with Agent Rankin in Key Largo, where Altuve lived. Fernandez was at one of these meetings. This took place in January 1993, or some time later. Altuve believes it was subsequent to his guilty plea.

Altuve also participated in a meeting at Fernandez' office to discuss his guilty plea. Also present were Jon May, Ossa, Almeida and Trejo. Altuve did not recall if Ruben Oliva attended, but was certain that Rubino did not. Altuve was represented by Fernandez at that meeting, as was Trejo. No one was representing Ossa. By that time, Altuve was somewhat upset with Fernandez because Fernandez was not taking good care of him.

During the meeting, Altuve noticed that the plea agreement said nothing about "one for all, all for one" cooperation. Altuve asked Fernandez if this had been written down somewhere. Fernandez replied that this had been arranged with the AUSA, and they would receive it. Altuve recalled that he asked Fernandez more than ten times to get this in writing. Moreover, if Altuve had known it was not in writing, he would not have signed the plea agreement.

Altuve testified that he had not given Fernandez permission to represent Ossa. Fernandez had never asked for permission, and they had no discussion about this.

Altuve was unhappy about Fernandez representing Ossa at the time of the plea.

*4. Testimony of Joaquin Fernandez:* Fernandez stated that the "joint cooperation concept" was not memorialized in the plea agreement because it was "kind of bizarre and different," and he did not think AUSA Wallace would have written it in. However, both Wallace and the agent said there would be no problem with it. Fernandez understood that the cooperation of one or more of the defendants would inure to the benefit of them all, and this is what he told each of the defendants.

This aspect of the defendants' cooperation was neither memorialized in the plea agreements nor communicated to the Court. Fernandez did not think that it mattered, because it was understood, and because he trusted AUSA Wallace and took him at his word. Fernandez concluded, however, that he had not done a good job for his client because he "had no recourse".

*5. Testimony of Jon May at the hearing on the defendant's motion to enforce plea agreement:* With regard to the withdrawal of Frank Rubino prior to the meeting with AUSA Wallace in the Fall of 1993, May testified as follows:

Q. Was Mr. Ossa's lawyer there, Frank Rubino?

A. No.

Q. And why was he not there, if you know?

A. Well, Frank is one of the few lawyers in town who not only says but actually will not represent any individual who cooperates, so at the point where we began the discussion of cooperation Frank said, "I'm out of it."

Q. And that discussion obviously began prior to the time you had this meeting?

A. Yeah.

Q. Who was representing Mr. Ossa's interests at the meeting?

A. Well, at that point we were sort of representing everybody's interests. No one had filed an appearance specifically

representing Ossa, so it was somewhere between Joaquin Fernandez and I. We were both there representing Ossa's interests along with everybody else's interests at that point. He didn't have specifically his own counsel there because, again, Frank was out of it so we were sort of stepping in to negotiate on his behalf.

*See* Transcript of Proceedings on Motion to Enforce Plea Agreement, December 19, 1995, at 12–13.

### III. Credibility assessments:

Adopting Magistrate Judge Snow's assessments, the undersigned finds credible the testimony of all three movants that they detrimentally relied on the advice provided by attorneys Fernandez and May that each of them would benefit from the cooperation provided by any of the others, and that their sentences would be reduced to ten years or less.[8] Similarly adopting Magistrate Judge Snow's findings, the undersigned concludes that movant Ossa testified truthfully when he stated that his lawyer, Frank Rubino, literally abandoned Ossa without notice or explanation, leaving him to rely on the good graces of May and Fernandez in negotiating his plea.

Indeed, as pointed out by Magistrate Judge Snow, there is no evidence in the record that Frank Rubino ever advised his client that he did not represent people who cooperate or that he intended to withdraw as Ossa's counsel. Nor is there any evidence that Ossa was advised by anyone that Rubino in fact had withdrawn as counsel or that Jon May had entered an appearance on his behalf. The uncontroverted evidence in the record establishes that as soon as the subject of cooperation arose, Rubino stopped showing up at meetings and had no further contact with his client.

### DISCUSSION

As noted by Magistrate Judge Snow in her Recommendations of Law, Trejo, Ossa

and Oracio Altuve seek to withdraw their respective guilty pleas based on ineffective assistance of counsel. They assert that they relied on the representations made by attorneys May and Fernandez that: (1) the cooperation of any one defendant would inure to the benefit of all of them; (2) that this agreement need not be included in the plea agreement because it had been arranged with the prosecutor; (3) that based on their cooperation, the defendants would receive a sentence as low as five years imprisonment, but in any case not more than ten years. Ossa also contends that his lawyer, Frank Rubino, provided *no* advice or assistance, once the defendants began to discuss cooperation, and Ossa relied instead on the statements of Jon May and Joaquin Fernandez. Additionally, all defendants contend that the fact that, at various times in the proceedings, attorneys May and Fernandez represented more than one defendant, gave rise to a conflict of interest.

The legal standards applicable to the defendants' claims are fully discussed by Magistrate Judge Snow in her Report and Recommendation. Essentially, a criminal defendant's challenge to his guilty plea on the basis of ineffective assistance of counsel requires a showing that counsel's representation fell below an objective standard of reasonableness and that the criminal defendant was prejudiced by his counsel's errors. *Thompson v. Wainwright*, 784 F.2d 1103, 1105 (11th Cir.1986) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). The "prejudice" requirement:

... focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process ... in order to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would

---

**8.** As more fully discussed below, in finding that the defendants received inadequate representation the undersigned is not influenced by the defendants' expectations of sentence reductions, *per se,* but by counsel's failure to incorporate into the written plea agreements the foundation for such expectations; i.e. the terms of the "group cooperation".

not have pleaded guilty and would have insisted on going to trial.

*Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985).

■ Having reviewed Magistrate Judge Snow's legal analysis, the Court concurs with her "inescapable conclusion" that the representation provided to Trejo, Ossa and Altuve fell below an objective standard of reasonableness and that such inadequate representation prejudiced each of them. The undersigned further agrees with and adopts Magistrate Judge Snow's legal conclusion that there is a reasonable probability that, but for counsel's misguided advice, none of the movants would have pleaded guilty and would have insisted upon going to trial. However, the undersigned differs with Magistrate Judge Snow to the extent that she equated counsel's erroneous advice with their predictions regarding sentences.

In denying the motion to enforce plea agreement, the undersigned was not influenced by the defendants' individual expectations (based on what the attorneys told them) of what sentence might be imposed. In concluding that the defendants received inadequate representation, the undersigned is, once again, not influenced by their attorneys' "predictions" of sentence reduction. Rather, the undersigned concludes that the inadequate representation arises from the extent to which counsel ignored the defendants' concerns over lack of mention to the Court, or inclusion in the plea agreement, their understanding of cooperation as "one for all, all for one." In its omnibus objections to Magistrate Judge Snow's Report, the government attempts to defeat the inadequate representation claim by relying on the uncontroverted facts that each movant essentially understood that he would be required to provide assistance and that the government had the ultimate discretion in filing a motion to reduce sentence; that each movant was aware of the minimum mandatory ten-year sentence, with a potential maximum of life imprisonment; and, that each movant had been informed that no sentencing "predic-

tion" would be binding on the Court or the government. This rather ingenuous and professionally sophisticated analysis might well apply to the defendants' attorneys, but it still begs the question of defendants' reliance upon their attorneys' advice that the anticipated "group" cooperation benefit need not be specified in the plea agreement. Because Ossa, Altuve and Trejo detrimentally relied upon this advice in deciding to change their pleas to guilty, said pleas must be set aside on the grounds of prejudicially inadequate representation.

■ As more fully discussed below, and contrary to Magistrate Judge Snow's conclusion, the undersigned also finds that a severe conflict of interest permeated these proceedings. The applicable standard, taken from Magistrate Judge Snow's Report and Recommendation, is as follows. In *Ford v. Ford,* 749 F.2d 681 (11th Cir.1985), the Eleventh Circuit addressed the question of whether a defendant whose counsel had a conflict of interest could enter a valid plea of guilty. In that opinion, the court, first, noted its holding in *Scott v. Wainwright,* 698 F.2d 427, 429 (11th Cir.1983), that a "guilty plea cannot have been knowing and voluntary, however, if a defendant does not receive reasonably effective assistance of counsel in connection with the decision to plead guilty, because the plea does not then represent an informed choice." *Ford,* 749 F.2d at 683. Accordingly, where a court has determined that the defendant's counsel represented conflicting interests, the defendant has been deprived of effective assistance of counsel and his guilty plea cannot have been knowing or voluntary, or the product of an informed choice. *Id.*

As previously noted, the evidence presented at the hearing on the motion to enforce plea agreement had already created misgivings in the undersigned's mind regarding the conduct of counsel. There, Jon May had recounted Frank Rubino's purported practice of refusing to represent

individuals who cooperate with the government and his decision to "be out of it", at the point where his client began to discuss cooperation. According to May, at that point the attorneys

> ... were sort of representing everybody's interests. No one had filed an appearance specifically representing Ossa, so it was somewhere between Joaquin Fernandez and I. We were both there representing Ossa's interests along with everybody else's interests at that point. He didn't have specifically his own counsel there because, again, Frank was out of it so we were sort of stepping in to negotiate on his behalf.

*See* Transcript of Hearing on Motion to Enforce Plea Agreement, held on December 15, 1995, at 12–13.[9] While the issue of defendants' representation was not before the Court at that time, the tenor of the hearing engendered the Court's comment regarding counsel's lack of punctiliousness in the exercise of their duties, specifically with regard to their failure to commit to writing their own clients' understanding of their plea agreements.

Sadly, this was only the tip of the iceberg. Yet, it was the logical outcome of counsels' failure to operate within the boundaries of individual representation. The clients' concept of cooperation as "one for all and all for one" appears to have spilled over to their attorneys' concept of representation. Examples of this haphazard "group representation" abound in the record. Joaquin Fernandez, who was Altuve's attorney, communicated directly with both Ossa and Trejo. Meetings were held with the prosecutor and/or case agent where not all of the defendants were present; some defendants were present without their attorneys; and some attorneys were present without their respective clients. Fernandez ostensibly "stood-in" for Frank Rubino, Ossa's attorney of record, at the change of plea hearing and

signed Ossa's plea agreement "for" Rubino. During the plea colloquy, Ossa told the Court that he had fully discussed the contents of the indictment and the plea agreement, as well as the sentencing guidelines, with his lawyer and that he was satisfied with counsel's services. Nevertheless, by his own admission, Ossa knew that the undersigned was referring to Rubino; however, he did not correct this misperception. Jon May, Trejo's attorney, signed Ossa's objections to the Presentence Investigation Report "for" Rubino. Yet, in both Trejo's and Ossa's objections, references are made to *both* defendants. Ultimately, at the sentencing hearing, May represented both of them. During the entire case, Fernandez and Rubino operated out of the same office address and shared the same telephone number. In the interim, between the change of plea hearing and the sentencing hearing, Jon May came to use the same office facilities and telephone number.

This "musical chairs" method of representation succeeded in maintaining the outward appearance that Frank Rubino was continuing to fulfill his duties as counsel of record for Bernardo Arturo Ossa when in fact Rubino had long abandoned his client from the time that attempts to cooperate with the government commenced. Rather than informing his client of his purported refusal to represent "cooperating" defendants, and officially withdrawing from the case, Rubino left it to others to explain his absence from meetings and hearings, apparently not with sufficient clarity, to Ossa. Thus, when Rubino finally withdrew, two months prior to sentencing, his client was not notified. Indeed, Ossa had expected Rubino, not May, to represent him at the sentencing hearing.[10] Moreover, Rubino similarly failed to inform the Court of his "de-facto" decision to withdraw from Ossa's representation,

---

9. Contrary to May's testimony, as documented in this Memorandum Opinion, Rubino had indeed filed a notice of appearance as permanent counsel for Ossa at the latter's arraignment on April 14, 1992 and did not formally withdraw from Ossa's representation until April 26, 1993.

10. May's own client, Trejo, was similarly kept uninformed of this attorney "shell game."

leaving it to Fernandez and May to "stand-in" at hearings and sign pleadings "for" him. Thus, Rubino's conduct exacerbated the conflict of interest that had already been created by counsels' promiscuity, since he left Ossa's fate in the hands of attorneys who owed their duty of undivided loyalty to Ossa's co-defendants; not to him. As a result, the "taint" of conflict spread to all three defendants.

The undersigned concludes, therefore, that Ossa's, Altuve's and Trejo's respective guilty pleas must be set aside on the grounds of ineffective assistance of counsel, arising from prejudicial conflict of interest, as well as prejudicially inadequate representation.

## CONCLUSION

Based on the foregoing considerations, Julio Trejo's, Oracio Altuve's and Bernardo Arturo Ossa's respective motions to vacate, set aside, or correct sentence, filed pursuant to 28 U.S.C. § 2255, are granted in separate orders issued contemporaneously with this Memorandum Opinion.

DONE AND ORDERED.